684 S.E.2d 29 (2009)
299 Ga. App. 765
In the Interest of D.L.T.C. and S.F.L.C., Children.
Nos. A09A1009, A09A1010.
Court of Appeals of Georgia.
August 20, 2009.
*30 Jones & Erwin, Anthony B. Erwin, Calhoun, for appellant (case no. A09A1009).
William R. Thompson, Jr., Joseph D. Little, for appellant (case no. A09A1010).
Richard K. Murray, George P. Govignon, Calhoun, for appellee.
MIKELL, Judge.
In Case Nos. A09A1009 and A09A1010, respectively, the biological mother and father of D.L.T.C. and S.F.L.C. appeal a Gordon County Juvenile Court order terminating their parental rights to the children. We consolidated the two cases to resolve the issues on appeal. For reasons that follow, we reverse the termination order.
In cases involving the termination of parental rights, "[t]he standard of review is whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's right to custody should be terminated."[1] "This Court neither weighs evidence nor determines the credibility of witnesses."[2]
In this case, the evidence is undisputed. The record shows that the biological parents have been consistently involved in the process since the children were removed from their custody by the Gordon County Department of Family and Children Services ("DFACS"). The mother and father were never married but had two children, D.L.T.C., born on March 4, 2001, and *31 S.F.L.C., born on April 30, 2003. In early 2004, when the father was arrested on drug charges and the mother lacked stable housing and employment, DFACS sought and received emergency custody of the children. At a detention hearing two days later, the mother consented to the girls being placed with their paternal uncle and aunt, Brian and Carla Burnett.[3]
At the next hearing on April 16, 2004, the mother admitted to using drugs. The father refused to take a drug test but expressed his intent to legitimate the children. The court concluded that the children were deprived and should remain in the custody of the Burnetts. On August 27, 2004, DFACS filed a complaint seeking nonreunification and a petition to place the children with the Burnetts until they reached the age of 18. On November 30, 2004, the father filed a motion, seeking to intervene, legitimation, and custody of the children. The nonreunification hearing was held several days later on December 2, 2004. The court granted the petition as to the mother, finding that she failed to comply with case plan goals, failed to stay in touch with her case manager, and failed to address her substance abuse problem. The court also ordered that the mother and father were allowed to visit the children on alternate Sundays.
On February 17, 2005, the father's motion for legitimation was granted. The next judicial review order, entered on April 18, 2005, nunc pro tunc, February 17, 2005, allowed the father 48-hour weekend visitation with the children at his mother's house and allowed the mother two hours of visitation at the paternal grandmother's home on one weekend per month. An ex parte order entered that same day, however, suspended the mother's visitation between April 28, 2005 and May 26, 2005, because she left a harassing message on the Burnetts' answering machine. In an order entered on July 18, 2005, the court found that the father was doing better and noted that it had allowed DFACS to close its case on the matter. The children were still found to be deprived and the permanency plan was reunification with the father, with temporary custody remaining with the Burnetts. That order also allowed the father to take the children with him on a family vacation and increased the mother's visitation to two-hour visits every other week at the Burnetts' home.
On January 4, 2006, an order was entered granting the father visitation every weekend and requiring him to attend counseling with Dr. Trish Wright of Calhoun Counseling Center or any other family counselor. An emergency ex parte order was entered on March 24, 2006, however, suspending the father's visitation until March 27, 2006, on the ground that he allowed the children to visit their mother and committed acts of domestic violence in their presence. On April 26, 2006, an order was entered that reduced the mother and father's visitation to weekly supervised visitation at a visitation center. This visitation schedule remained in place through the next hearings on June 19, 2006, and July 19, 2006.
On September 12, 2006, the mother filed a petition for review to have her visitation privileges reinstated after learning they were suspended due to missed visits. The father filed a petition for review on October 20, 2006, seeking modification of his visitation schedule due to the favorable resolution of criminal charges against him[4] and his attendance at counseling with the children. On October 30, 2006, the mother and father's weekly supervised visits with the children were reinstated and the father was also given two additional hours of unsupervised visitation. At a hearing on May 23, 2007, a counselor, who had met with the parties, concluded that the children were "securely attached to each one of the care givers."
The Burnetts filed a petition to adopt the children in the Superior Court of Gordon County. On June 7, 2007, the Superior *32 Court ordered the juvenile court to complete an investigation and give a recommendation regarding the termination of the parental rights of the mother and father, which would be utilized in rendering a decision on the adoption petition. Following that request, the juvenile court entered an interim order allowing both parents increased visitation. In its report to the Superior Court, the juvenile court recommended that the parents' rights be terminated and that the adoption proceed. The adoption hearing occurred on August 18, 2007.[5] At the adoption hearing, the father moved for directed verdict. The superior court ruled that the evidence did not support a showing of an inability on the father's part to parent the children and refused to grant the petition for adoption.[6]
Four days later on August 22, 2007, the Burnetts filed a petition for termination of parental rights in juvenile court, which they voluntarily dismissed on January 29, 2008. On March 20, 2008, the Burnetts filed another petition to terminate parental rights, which is the petition at issue in this appeal. In their petition, the Burnetts stated that a material change in circumstances had occurred over the previous six months. Specifically, the father's verbal abuse of the children had increased and the parents had attempted to damage the bond the children had with the Burnetts. The Burnetts argue that consequently, the stress on the children had increased and that additional bonding had occurred between them and the children, increasing the need for immediate permanency.
The hearing on the petition at issue here occurred on May 12, 2008. At the hearing, Dr. Wright testified that since the last hearing, the children told her that they witnessed domestic violence between their mother and stepfather, and between their father and his mother, as well as between their father's fiancee and his mother and that their father had been verbally abusive to the younger child. According to Dr. Wright, the children also told her that the parents told them not to listen to the Burnetts because they were not their real parents. Dr. Wright opined that the children suffered continual emotional trauma from visiting their parents and that they needed permanency with the Burnetts, whom they considered their primary caretakers. Additionally, if removed from the Burnetts' custody, the children would suffer anxiety and depression and would act out.
Several witnesses testified on behalf of the father that he had a wonderful bond with the children and that they cried when it was time to go back to the Burnetts' home; that they never witnessed any inappropriate conduct by the father in the children's presence; and that he would be a great father to the children. Witnesses also testified on behalf of the mother that the children loved and missed her and did not want to be returned to the Burnetts after visiting with their parents; and that the mother would be a good parent. Both parents also testified. After hearing the evidence, the court entered an order terminating both parents' rights on May 19, 2008.
In its order, the court concluded that the children had been deprived for four years but that "the primary issue of deprivation [was] that the [children] are so bonded with the Burnetts that removal from the home would be seriously damaging to them" and that the "lack of bonding, caused by the lack of parental care, [was] the primary cause of deprivation." The juvenile court concluded that the deprivation was likely to continue, stating "[a]dmittedly, the nature of the deprivation has `shifted'-at first they were deprived because their mother was homeless and on drugs, and the father was in jail because of drugs; today, the girls are deprived because they would be seriously damaged upon removal from [the Burnetts]." Additionally, the court concluded that since the children had been with the Burnetts for four years during the most formative years of their lives, a lack of permanency would be totally destructive to them, causing them to be at risk of progression through depression and anxiety. The court determined that the *33 best interests of the children required the termination of their parents' rights and their adoption by the Burnetts. It is from this order that the parents appeal.
Before terminating a parent's rights, a juvenile court must employ a two-prong test. In the first prong, the court must decide whether there is present clear and convincing evidence of parental misconduct or inability. OCGA § 15-11-94(a). Parental misconduct or inability, in turn, is proven by evidence showing: (1) that the child is deprived; (2) that lack of proper parental care or control is the cause of deprivation; (3) that the cause of deprivation is likely to continue or will not likely be remedied; and (4) that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. OCGA § 15-11-94(b)(4)(A). In the second prong of the termination test, the juvenile court must consider whether termination of parental rights would be in the best interest of the child.[7]
Both parents argue that the court erred in finding parental misconduct or inability. Specifically, both parents attack the trial court's finding on the third factor of this prong that the deprivation was likely to continue because the children would be seriously damaged if removed from the Burnetts. We will therefore focus our review accordingly.
1. "[I]t is well settled that a juvenile court may consider the past conduct of the parent in determining whether the conditions of deprivation are likely to continue."[8] However, "it is equally true that evidence of past unfitness, standing alone, is insufficient to terminate the rights of a parent in her natural child; clear and convincing evidence of present unfitness is required."[9] Moreover, "the record must ... contain clear and convincing evidence that the cause of the deprivation is likely to continue."[10] The parents argue that the court made no finding of present unfitness that supported the termination of their parental rights, and we agree.
A finding of unfitness must center on the parent alone, that is, can the parent provide for the child sufficiently so that the government is not forced to step in and separate the child from the parent. A court is not allowed to terminate a parent's natural right because it has determined that the child might have better financial, educational, or even moral advantages elsewhere.[11]
In the instant case, the juvenile court found that both parents were negative for illegal drugs; that the father was gainfully employed, had a new fiancee, had passed his home inspection, had been visiting regularly with his older son, and had been bringing him to visit the children; and that there were no safety concerns at the father's home. The court also noted that the mother was doing better, looked healthier, had custody of her one-year-old son, and was employed. The court commented that
the parents have done an admirable  but belated  job of getting their lives straightened out. [The parents] express love and devotion for their children. They can provide for the physical needs of the girls. Indeed, if four years ago they had been in the positions they are in now, the children would never have been taken away, and I would not have found deprivation.
Nonetheless, the court concluded that the children were deprived and the deprivation was likely to continue because the children would suffer damage if removed from the Burnetts' home. This evidence does not constitute clear and convincing evidence of parental misconduct and inability, as required by OCGA § 15-11-94(b)(4)(A)(iii).[12]
*34 As stated earlier, courts may consider past conduct when determining whether deprivation is likely to continue, but "[a] finding of parental unfitness must be based on present circumstances."[13] According to the court's own findings, the parents were not unfit. Instead, the court explained in its ruling that it was guided by the appellate courts' directive "to focus upon the critical need to preserve bonds that have developed between the children and their long-term placement resources." While this factor is indeed important, we have never directed that it be considered in a vacuum.
In In the Interest of D.W.A.,[14] a case relied upon by the juvenile court here, we held that a likelihood of serious harm was established where a psychologist testified that the children's emotional disorders would increase if they were returned to their mother.[15] But crucial to the decision in that case were additional facts: the mother missed several visitations with the children and provided no excuse for doing so; she did not have stable employment; and she had not obtained a safe and stable home for herself and her children, opting instead to continue to live with a boyfriend who had been abusive to her and her children.[16] In other cases cited by the juvenile court wherein we discussed the importance of the bond the children had developed with their foster parents, there was additional evidence that showed the parents' present unfitness and warranted the termination of the parents' rights.[17] Here, however, the juvenile court focused almost exclusively on the effect on the children if they were removed from the Burnetts, even though it acknowledged that the parents had shown a history of significant progress and that it would not have determined the children to be deprived under the circumstances that existed at the time of the hearing. As we have stated, termination of parental rights is a remedy of last resort and can be sustained only when there is clear and convincing evidence that the cause of the deprivation is likely to continue.[18] In the instant case, "[t]he evidence is not clear and convincing, at least at this time, that the deprivation is likely to continue. While we are reluctant to reverse the juvenile court's determination, no judicial determination is more drastic than the permanent severing of the parent-child relationship."[19] Accordingly, *35 we reverse the judgment and remand the case for the establishment of reunification plans for both parents, subject to whatever disposition is warranted by future events and those occurring since the last termination hearing.
2. Based on our holding in Division 1, we need not address the father's remaining enumeration of error.
Judgment reversed and case remanded with direction.
JOHNSON, P.J., and ELLINGTON, J., concur.
NOTES
[1] (Footnote omitted.) In the Interest of C.R., 245 Ga.App. 697, 538 S.E.2d 776 (2000).
[2] (Citation and footnote omitted.) In the Interest of A.T., 271 Ga.App. 470, 471, 610 S.E.2d 121 (2005).
[3] The father was not present at this initial hearing as his address was unknown at that time. The children have remained in the custody of the Burnetts since that time, and the Burnetts filed the petition to terminate parental rights at issue in this appeal.
[4] He had pled guilty to methamphetamine possession.
[5] Only the transcript of the ruling on the adoption petition is included in the record.
[6] Since both parents' rights had to be terminated to proceed with adoption, no further rulings were made in the adoption proceeding.
[7] (Citation omitted.) In the Interest of R.N.H., 286 Ga.App. 737, 739-740, 650 S.E.2d 397 (2007).
[8] (Citation omitted.) In the Interest of D.B.C., 292 Ga.App. 487, 496(1)(c), 664 S.E.2d 848 (2008).
[9] (Citation omitted; emphasis in original.) Id.
[10] (Citation omitted.) In the Interest of K.D.E., 288 Ga.App. 520, 524(1), 654 S.E.2d 651 (2007).
[11] (Footnote omitted.) In the Interest of J.J.J., 289 Ga.App. 466, 467, 657 S.E.2d 588 (2008).
[12] Compare In the Interest of S.H., 296 Ga.App. 768, 772(1), 675 S.E.2d 619 (2009) (evidence of present unfitness supported termination where mother was in process of completing drug treatment program but had not obtained stable housing or employment and had six other biological children that were not in her care); In the Interest of J.L.C., 292 Ga.App. 763, 768, 666 S.E.2d 98 (2008) (present unfitness evidenced by father's continued alcohol abuse, failure to have meaningful contact with the child, failure to maintain stable employment, and physical abuse of the mother) (whole court); In the Interest of C.A.S., 291 Ga.App. 204, 207, 661 S.E.2d 612 (2008) (no evidence of stable housing or income, prospects for employment or any significant efforts to comply with case plan).
[13] (Punctuation and footnote omitted.) In the Interest of L.J.L., 247 Ga.App. 477, 480, 543 S.E.2d 818 (2001).
[14] 253 Ga.App. 346, 559 S.E.2d 100 (2002).
[15] Id. at 349, 559 S.E.2d 100.
[16] Id. at 348, 559 S.E.2d 100.
[17] See In the Interest of L.E.C., 253 Ga.App. 82, 87, 558 S.E.2d 56 (2001) (juvenile court expressly found that mother's testimony regarding her present living circumstances and her ability to support the children was not credible and that mother had failed to complete counseling, was unemployed and lacked any employment history for the past five years, and had no identifiable source of income, phone, or driver's license); In the Interest of H.D.M., 241 Ga.App. 805, 806-807(1), 527 S.E.2d 633 (2000) (father last visited child 11 months before termination hearing, had not tried to arrange additional visits, and offered no evidence that he complied with goals of reunification plan); In the Interest of K.D.S., 237 Ga. App. 865, 866-867(1)(b), (c), 517 S.E.2d 102 (1999) (mother saw child twice during year preceding filing of petition, and then only because foster parents took him to see her; she also failed to appear for scheduled visits, refused to cooperate in counseling efforts, and did not establish a stable living environment until after petition filed).
[18] In the Interest of K.D.E., supra at 526(1), 654 S.E.2d 651.
[19] (Citations and punctuation omitted.) Id., citing In the Interest of K.M., 240 Ga.App. 677, 680-681, 523 S.E.2d 640 (1999). See also In the Interest of R.C.M., 284 Ga.App. 791, 799-800(III)(3), 645 S.E.2d 363 (2007) (termination of parental rights reversed where petition filed during father's previous incarceration and father had not been given realistic opportunity to achieve reunification goals); In the Interest of L.J.L., supra (mother's prior drug use did not support termination of parental rights in light of significant recent improvements).