**THIRD DIVISION**
**ELLINGTON, P. J.,**
**DILLARD and MCFADDEN, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**July 2, 2015**

# In the Court of Appeals of Georgia

A15A0533. IN THE INTEREST OF S. O. C., a child.

DILLARD, Judge.

The mother of a minor child, S. O. C., appeals from an order of the Juvenile Court of Hall County terminating her parental rights and its subsequent denial of her motion for new trial. Specifically, the mother contends that the court lacked clear and convincing evidence to support its findings that (1) the child was deprived; (2) lack of proper parental care or control caused the deprivation; (3) such cause was likely to continue; and (4) the continued deprivation would cause or was likely to cause serious physical, mental, or emotional harm to the child. Because we find that there was insufficient evidence to support the juvenile court's finding that continued deprivation would cause or was likely to cause harm to the child, we reverse.

Viewed in the light most favorable to the juvenile court's findings,[1] the evidence shows that S. O. C. was born on December 26, 2011, a few weeks premature. At the time of his birth, S. O. C. had marijuana metabolites in his system and he was underweight. Additionally, at that time it was determined that both the mother[2] and S. O. C. were HIV-positive. As a result, on January 17, 2012, Hall County Department of Family & Children Services ("DFCS") successfully sought an authorization for shelter care. On January 24, 2012, the mother moved to contest the authorization of shelter care, and on that same day, DFCS filed a deprivation petition. Following a February 10, 2012 hearing, the juvenile court entered an order finding that S. O. C. was deprived based on its conclusion that the mother's marijuana use impaired her ability to care for S. O. C.'s medical needs. Nevertheless, the court returned custody of S. O. C. to his mother subject to several conditions, including that the mother refrain from illegal drug use, attend to S. O. C.'s medical needs, and continue living with her boyfriend, who had stable employment, a stable residence, and wished to raise S. O. C. as his own son.

---

[1] *See In the Interest of T. W.*, 297 Ga. App. 886, 886 (678 SE2d 546) (2009).

[2] S. O. C.'s biological father has never been identified and is not a party to this proceeding.

On May 23, 2012, the juvenile court issued a judicial-review order, finding that the mother had remained drug free and otherwise compliant with her case plan. The court entered a similar order on September 12, 2012, finding that the mother had completed a parenting class, taken S. O. C. to all of his medical appointments, and had remained in the residence she shared with her boyfriend. However, she had missed a recent drug screening, which the court considered to be equivalent to a positive test. In addition, as a result of a substance-abuse assessment, the mother was advised to undergo 17 weeks of substance-abuse treatment. But she disagreed with this assessment and indicated her intention to seek a second opinion.

On January 17, 2013, DFCS filed another deprivation petition, alleging that the mother had tested positive for marijuana in an August 2012 drug screening and that she had missed other screenings and failed to attend the recommended substance-abuse-treatment classes. However, on February 4, 2013, the juvenile court issued an order, stemming from a November 19, 2012 hearing, in which it allowed the mother to keep custody of S. O. C. in light of the fact that she had not failed any additional drug tests since the August screening. But one day later, the court issued an order finding that the mother had tested positive for marijuana in August and September

2012, and warning her that further substance abuse would likely result in the loss of custody of S. O. C.

On April 10, 2013, after a February 18, 2013 hearing, the juvenile court again found S. O. C. to be deprived based on the fact that the mother had failed to complete the substance-abuse-treatment classes, had tested positive for marijuana as recently as December 2012, and had missed several other scheduled drug screenings. However, the court delayed final disposition of S. O. C. to allow the mother to enter the Hall County Family Treatment Court. This order was followed by an order of final disposition on April 24, 2013, which allowed the mother to retain custody of S. O. C. subject to her successful completion of Family Treatment Court program. But on May 1, 2013, after determining that the mother had tested positive for marijuana in three recent drug screenings (and, therefore, was required to serve a 15-day jail term), the juvenile court entered an order placing custody of S. O. C. with DFCS. At that time, the mother requested that custody be placed with her boyfriend, but the court declined to do so because he had no one to provide child care while he worked. On June 10, 2013, the court entered a final disposition order, again noting that it was placing custody of S. O. C. with DFCS based on the mother's continued marijuana use.

Shortly thereafter, a reunification plan was established. Nevertheless, over the course of the next few months, the mother served short jail terms on at least five separate occasions after either testing positive for marijuana or missing screenings (required by the Family Treatment Court). Consequently, on October 8, 2013, DFCS filed a petition to terminate the mother's parental rights. Initially, the juvenile court scheduled a hearing on the matter for January 3, 2014. But after learning that the mother had been hospitalized since late November 2013, due to pneumonia and resulting respiratory failure , the court continued the case for several weeks.

On January 24, 2014, the juvenile court held an evidentiary hearing on DFCS's petition to terminate the mother's parental rights. During that hearing, the coordinator for the Family Treatment Court testified that the mother initially enrolled in the program on March 6, 2013, and was eventually discharged on September 4, 2013, for repeated failures to comply with the program's requirements. Specifically, the court found that the mother often missed drug screenings and failed to attend treatment counseling sessions. And as a result of these failures, she was incarcerated on several occasions. Additionally, the mother attempted to forge documents indicating that she had performed the required community service. And although she appeared to genuinely love S. O. C. and had not actually tested positive for marijuana since May

5

27, 2013, the Family Treatment Court's supervisors ultimately discharged her from the program due to her inability to take responsibility for her actions and her overall dishonesty.

A licensed social worker with the Family Treatment Court also testified that the mother was dishonest and seemed to be in denial regarding her substance-abuse problem. The social worker added that the mother often missed counseling sessions. Finally, the social worker also noted that although it appeared toward the end of her time in the program that the mother had stopped her drug abuse, she still displayed the behavioral signs—primarily dishonesty—of a dependent person.

Additionally, the DFCS caseworker assigned to the mother's case testified that she had stable housing and was employed prior to her hospitalization, but that she had failed to complete other requirements of her reunification plan, including attending drug screenings scheduled after her discharge from Family Treatment Court and completing additional parenting classes. The caseworker did acknowledge, however, that the mother attended all of S. O. C.'s medical appointments despite no longer having custody of the child. As for S. O. C., the caseworker stated that he had been with his current foster family since November 2013, and was doing quite well.

The foster mother echoed the caseworker's testimony that S. O. C. was doing well since being placed in her family's care on November 2, 2013, and further stated that she and her husband wished to adopt the child. She also testified that she and her husband were very diligent about administering the three medications required to treat S. O. C.'s HIV and attending all of the child's medical appointments. The foster mother added that during one of these appointments, S. O. C. did not want to go to his mother upon seeing her at the clinic and that the child seemed grumpy or withdrawn after the scheduled weekly visits with his mother.

During the hearing, the mother's boyfriend discussed his employment as a restaurant manager and informed the court of his intention to marry the mother and adopt S. O. C., whom he loved and viewed as his own son. He also claimed that he did not tolerate drug abuse and that he had given the mother an ultimatum to cease her use of marijuana, but that despite her past drug use, the mother had always appropriately cared for S. O. C. Additionally, the boyfriend did not think the mother had used drugs since S. O. C.'s birth.

The mother also testified during the hearing, noting that her recent failures to comply with the reunification plan were due to her lengthy hospitalization. And despite her hospitalization, the mother explained that she remained employed and still

7

lived with her boyfriend, whom she planned to marry. She also acknowledged that she had used marijuana for a significant portion of her life, but that she had never neglected S. O. C., and that his health never suffered while he was in her care. Indeed, the mother went on to explain that she had always properly administered his medications and had never missed his medical appointments even though she often did not have reliable transportation.

In support of her testimony, the mother introduced an affidavit of a social worker from the pediatric clinic in Atlanta where S. O. C. receives treatment. In that affidavit, the social worker noted that she had known S. O. C. and the mother since the child's birth and that the mother had always attended his medical appointments and properly administered his medications. In fact, the social worker averred that she had no concerns with regard to the medical care S. O. C. received while in his mother's custody.

At the conclusion of the hearing, the juvenile court granted DFCS's petition to terminate the mother's parental rights. And in an order issued on March 20, 2014, the court reiterated that ruling, finding, *inter alia*, that the mother's history of drug use deprived S. O. C. and that, given the child's medical condition, the mother's drug use could potentially endanger his health. The court further found that S. O. C. was doing

well with his foster family, who wished to adopt him, and that S. O. C. could no longer wait for the mother to comply with the reunification goals. Thus, the court found that termination of the mother's parental rights was in the child's best interests.

Subsequently, the mother filed a motion for new trial, which the juvenile court denied. She then filed an application for discretionary appeal with this Court, which we granted. This appeal follows.

At the outset, we note that on appeal from a termination order, we view the evidence in the "light most favorable to the juvenile court's ruling and determine whether a rational trier of fact could have found by clear and convincing evidence that the parent's rights should have been terminated."[3] A juvenile court's termination of parental rights involves a two-step process.[4] The first step dictates a finding of

---

[3] *In the Interest of A. T.*, 316 Ga. App. 782, 784-85 (730 SE2d 451) (2012) (punctuation omitted).

[4] We note that Title 15 has been significantly revised by the General Assembly, with the revisions effective as of January 1, 2014. Ga. L. 2013, p. 294, Part V, § 5-1 ("This Act shall become effective on January 1, 2014, and shall apply to all offenses which occur and juvenile proceedings commenced on and after such date."). Here, although the hearing and the juvenile court's decision occurred in January 2014, the termination proceedings commenced when the State filed its petition in October 2013. Thus, we review the juvenile court's decision under the former version of the statute. *See, e.g.*, *In the Interest of G. R. B.*, 330 Ga. App. 693, 693 n.1 (769 SE2d 119) (2015). And although it appears that the juvenile court, at least in part, relied on the revisions to the code in its order, that reliance does not affect our analysis.

9

parental misconduct or inability, which requires clear and convincing evidence that (1) the child is deprived; (2) lack of proper parental care or control is the cause of the deprivation; (3) such cause of deprivation is likely to continue; and (4) the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child.[5] If these four factors are satisfied, the court must then determine whether termination of parental rights is "in the child's best interest, considering physical, mental, emotional, and moral condition and needs, including the need for a secure and stable home."[6]

Importantly, our analysis is guided by an overarching constitutionally based principle that the termination of parental rights is a "remedy of last resort which can be sustained only when there is clear and convincing evidence that the cause of the deprivation is likely to continue."[7] Indeed, as our Supreme Court has emphasized,

---

[5] *See* former OCGA § 15-11-94 (a), (b) (4) (A) (i) - (iv); *In the Interest of A.T.*, 316 Ga. App. at 784; *In the Interest of D. W.*, 294 Ga. App. 89, 91 (1) (668 SE2d 533) (2008).

[6] *In the Interest of D. W.*, 294 Ga. App. at 91 (1) (punctuation omitted); *accord In the Interest of J. V. J.*, 329 Ga. App. 421, 424 (765 SE2d 389) (2014); *In the Interest of A. T.*, 316 Ga. App. at 784.

[7] *In the Interest of T. Z. L.*, 325 Ga. App. 84, 91 (1) (a) (751 SE2d 854) (2013) (punctuation omitted); *accord In the Interest of J. V. J.*, 329 Ga. App. at 424; *In the Interest of C. J. V.*, 323 Ga. App. 283, 287 (746 SE2d 783) (2013).

10

"one who is subject to the termination of parental rights cannot be equated to an individual who faces an interruption of custody" because termination "is a much more severe measure" that acts "to address the most exceptional situation of a deprived child and that child's continuing deprivation."[8] Put another way, it is one thing to remove a child from a parent's custody for reasons of neglect, but quite another to permanently and irrevocably sever the natural parent-child relationship. And there is a reason for this crucial distinction: Terminating a parent's rights, and thus forever foreclosing the possibility of restoring the natural parent-child relationship, is governmental extinguishment of the parent and child's constitutional right to familial relations.[9] There is, then, no judicial determination which has "more drastic significance than that of permanently severing a natural parent-child relationship."[10]

---

[8] *In the Interest of A. C.*, 285 Ga. 829, 833 (2) (686 SE2d 635) (2009).

[9] Unlike a custody proceeding, the termination of a natural parent's right to familial relations with his or her child "leaves the parent with no right to visit or communicate with the child, to participate in, or even to know about, any important decision affecting the child's religious, educational, emotional, or physical development." *Lassiter v. Dep't of Soc. Servs. of Durham County, N.C.*, 452 U.S. 18, 39 (I) (A) (101 SCt 2153, 68 LE2d 640) (1981).

[10] *In the Interest of L. J. L.*, 247 Ga. App. 477, 479 (543 SE2d 818) (2001) (punctuation omitted); *accord In the Interest of J. V. J.*, 329 Ga. App. at 429; *In the Interest of K. J.*, 226 Ga. App. 303, 306 (1) (486 SE2d 899) (1997).

Accordingly, "compelling facts" are required to terminate parental rights.[11] And while the juvenile court may consider past parental conduct in deciding whether the cause of deprivation is likely to continue,[12] evidence of past unfitness, standing alone, is "insufficient to terminate the rights of a parent in her natural child."[13] Rather, clear and convincing evidence of "*present* unfitness is required."[14] Finally, this Court has repeatedly recognized that the constitutional right to "raise one's children is a fiercely guarded right in our society and law, and a right that should be infringed upon only

---

[11] *In the Interest of J. V. J.*, 329 Ga. App. at 424 (punctuation omitted); *accord Carvalho v. Lewis*, 247 Ga. 94, 94 (274 SE2d 471) (1981); *In the Interest of K. J.*, 226 Ga. App. at 306 (1).

[12] *In the Interest of D. W.*, 294 Ga. App. at 92 (1) (c); *accord In the Interest of J. V. J.*, 329 Ga. App. at 424; *In the Interest of A. H.*, 289 Ga. App. 121, 123 (1) (a) (656 SE2d 254) (2008).

[13] *In the Interest of C. J. V.*, 323 Ga. App. at 285 (punctuation omitted); *accord In the Interest of J. V. J.*, 329 Ga. App. at 424; *In the Interest of D. L. T. C.*, 299 Ga. App. 765, 769 (1) (684 SE2d 29) (2009).

[14] *In the Interest of C. J. V.*, 323 Ga. App. at 285 (punctuation omitted); *accord In the Interest of J. V. J.*, 329 Ga. App. at 424-425; *In the Interest of D. L. T. C.*, 299 Ga. App. at 769 (1).

under the most compelling circumstances."[15] With these guiding principles in mind, we will now address the mother's enumerations of error.

1. In her first two enumerations of error, the mother contends that the evidence was insufficient to support the juvenile court's findings that S. O. C. was deprived and that lack of proper parental care or control caused the deprivation. We disagree.

Formerly, Georgia law defined a deprived child as, *inter alia*, "a child who . . . [i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals."[16] And in determining whether a child is without proper parental care or control, the juvenile court is entitled to consider, *inter alia*, whether "there is excessive use of or [a] history of chronic unrehabilitated abuse of intoxicating liquors narcotic or dangerous drugs or controlled substances by the parent."[17] Furthermore,

---

[15] *In the Interest of J. V. J.*, 329 Ga. App. at 425 (punctuation omitted); *accord In the Interest of C. J. V.*, 323 Ga. App. at 283; *In the Interest of J. C.*, 242 Ga. 737, 738 (1) (251 SE2d 299) (1978); *In the Interest of M. A.*, 280 Ga. App. 854, 856 (635 SE2d 223) (2006); *In the Interest of T. J. J.*, 258 Ga. App. 312, 314 (574 SE2d 387) (2002).

[16] Former OCGA § 15-11-2 (8) (A).

[17] *In the Interest of N. H.*, 297 Ga. App. 344, 345 (1) (677 SE2d 399) (2009) (punctuation omitted); *see* former OCGA § 15-11-94 (b) (4) (B) (ii).

13

when there is clear and convincing evidence of such chronic unrehabilitated drug use, the juvenile court may infer an adverse impact on the child and find the child deprived.[18]

Here, construed in the light most favorable to the juvenile court's judgment, the evidence shows that over the course of nearly two years after S. O. C. was born, the mother failed multiple drug tests and missed numerous scheduled drug screenings. In fact, the evidence shows that the mother used marijuana for much of her life, including just before S. O. C. was born and when he was in her custody (albeit not in his direct presence). Indeed, the mother admitted as much during the evidentiary hearing. Thus, the evidence was sufficient to support the juvenile court's findings that S. O. C. was deprived and the mother's lack of proper parental care—her drug use—caused the deprivation.[19]

---

[18] *See In the Interest of N. H.*, 297 Ga. App. at 345 (1).

[19] *See In the Interest of P. O. M.*, 255 Ga. App. 534, 535 (1) (566 SE2d 334) (2002) (holding that mother's unrehabilitated drug use supported court's finding that child was deprived and that the deprivation was caused by mother's lack of proper parental care or control).

2. The mother also contends that the evidence was insufficient to support the juvenile court's finding that S. O. C.'s deprivation was likely to continue. Again, we disagree.

It is, of course, well settled that a juvenile court may consider "the past conduct of the parent in determining whether the conditions of deprivation are likely to continue[.]"[20] But as previously noted, it is equally true that "evidence of past unfitness, standing alone, is insufficient to terminate the rights of a parent in her natural child; clear and convincing evidence of *present* unfitness is required."[21] Nevertheless, in considering past deprivations compared to present achievements, juvenile courts are "entitled to assign much less weight to such 'assertions of sudden parental fitness' when compared to the other evidence."[22]

Here, the evidence shows that the mother remained meaningfully engaged in the life of S. O. C., had stable housing, and seemed to have stable employment. But the evidence also revealed that even after S. O. C. was removed from her custody, the

---

[20] *In the Interest of M. C.*, 287 Ga. App. 766, 768 (1) (c) (653 SE2d 120) (2007) (punctuation omitted).

[21] *Id.* at 769 (1) (c) (punctuation omitted).

[22] *Id.* (punctuation omitted).

15

mother tested positive for marijuana at least once and missed several other drug screenings, which resulted in her incarceration (as required by the Family Treatment Court program). In addition, during this same period of time, the mother failed to complete the required substance-abuse-treatment classes and counseling sessions that were part of her reunification plan. And while some of these failures were undoubtedly attributable to her lengthy illness, the lion's share occurred prior to her late-November hospitalization. Thus, the evidence was sufficient to support the juvenile court's finding that S. O. C.'s deprivation was likely to continue.[23]

3. Finally, the mother further contends that the juvenile court erred in finding that the continued deprivation will cause or is likely to cause serious physical, mental, or emotional harm to S. O. C. We agree.

Under former OCGA § 15-11-94 (b) (4) (A) (iv), the juvenile court must determine whether "continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child."[24] And as this Court explained some time ago,

---

[23] *See id.* (holding that father's failure to undergo regular drug screens and comply with other aspects of his reunification plan was sufficient evidence to support the juvenile court's finding that the child's deprivation was likely to continue).

[24] *In the Interest of J. E.*, 309 Ga. App. 51, 57 (1) (d) (711 SE2d 5) (2011) (punctuation omitted); *see* former OCGA § 15-11-94 (b) (4) (A) (iv).

16

it is not "*automatically* true that a finding that deprivation is likely to continue will support a finding that continued deprivation will harm the child."[25] Indeed, here, there is little to no evidence that the continued deprivation has or will harm S. O. C. Even when S. O. C. was still in the mother's custody, there was no evidence that he was neglected in any way or that his serious medical condition was inadequately monitored or treated. Rather, the evidence shows that the mother properly administered S. O. C.'s required medications and diligently attended all of his medical appointments. In fact, the mother's diligence in the latter regard continued even after S. O. C. was removed from her custody—*i.e.*, prior to her hospitalization, she traveled from Gainesville to meet S. O. C. and his foster parents at the Atlanta clinic where the child received treatment.

Furthermore, other than the foster mother's testimony that S. O. C. would sometimes seem grumpy after visiting with his mother, there was no evidence that (1) instability and impermanency were currently causing specific harms to S. O. C. or (2) the failure to terminate the mother's parental rights would be detrimental to the

---

[25] *In the Interest of J. E.*, 309 Ga. App. at 57 (1) (d) (punctuation omitted); *accord In the Interest of J. T. W.*, 270 Ga. App. 26, 36-37 (2) (d) (606 SE2d 59) (2004).

child.[26] Additionally, no caseworker testified as to any adverse effect on S. O. C. "by [his] remaining in foster care as opposed to [his] being permanently adopted."[27] To the contrary, the evidence shows that S. O. C. is currently thriving in foster care. And while the DFCS caseworker testified that she believes S. O. C. would possibly suffer harm if he was returned to the mother at this point, "the mother's [present] inability to care for her children does not necessarily mean that her current relationship with them is detrimental."[28]

In ruling that termination of the mother's parental rights was warranted, the juvenile court noted the strong bond between S. O. C. and his current foster parents, the admirable job they have done in caring for his medical needs, and their desire to adopt him. And while we certainly acknowledge and appreciate that S. O. C. is thriving in his foster home, as well as the commendable care the foster parents are

---

[26] *See In the Interest of A. T.*, 271 Ga. App. 470, 473 (610 SE2d 121) (2005) (holding that termination of mother's parental rights was not warranted when there was no evidence that mother's *present* relationship with the child was detrimental to the child's well-being); *accord In the Interest of D. F.*, 251 Ga. App. 859, 862 (555 SE2d 225) (2001).

[27] *In the Interest of A. T.*, 271 Ga. App. at 473.

[28] *In the Interest of J. S. B.*, 277 Ga. App. 660, 663 (2) (d) (627 SE2d 402) (2006) (punctuation omitted).

18

providing the child, "the juvenile court has no authority to sever the natural parent-child relationship simply because it believes the child would be better off with the foster family."[29] Indeed, the juvenile court's preference that S. O. C. remain with his foster family is "wholly without consequence, when the court lacked clear and convincing evidence to terminate the natural mother's parental rights."[30] As the Supreme Court of the United States so eloquently explained in the seminal decision of *Santosky v. Kramer*,[31] the "fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State."[32]

---

[29] *In the Interest of J. V. J.*, 329 Ga. App. at 428; *see also In the Interest of C. J. V.*, 323 Ga. App. at 291 (Dillard, J., concurring fully and specially) ("And while it is certainly heartening to know that the children are thriving in their foster home, the State has no business facilitating the adoption of children entrusted to its care until and unless a parent has, by her actions or inaction, forfeited her constitutional right to familial relations. The State's primary goal must be to maintain and preserve the natural parent-child relationship . . . .").

[30] *In the Interest of J. V. J.*, 329 Ga. App. at 428.

[31] 455 U.S. 745 (102 SCt 1388, 71 LE2d 599) (1982).

[32] *Id.* at 753 (II).

In summary, no judicial determination has a more "drastic significance than that of permanently severing a natural parent-child relationship, and it must be scrutinized deliberately and exercised most cautiously."[33] Thus, because the evidence did not clearly and convincingly establ ish that the continued deprivation will cause or is likely to cause serious harm to S. O. C., the juvenile court erred in terminating the mother's parental rights.[34] Accordingly, we reverse.

*Judgment reversed. Ellington, P. J., and McFadden, J., concur*.

---

[33] *In the Interest of J. V. J.*, 329 Ga. App. at 429 (citation and punctuation omitted); *accord In the Interest of K. J.*, 226 Ga. App. at 306 (1); *see also Nix v. Dep't of Human Res.*, 236 Ga. 794, 795 (225 SE2d 306) (1976) ("There can scarcely be imagined a more fundamental and fiercely guarded right than the right of a natural parent to [his or her] offspring.").

[34] *See In the Interest of J. S. B.*, 277 Ga. App. at 663-64 (2) (d) (holding that given the fact that there was no specific evidence that the children were currently suffering harm as a result of the continued deprivation, the juvenile court erred in terminating the mother's parental rights); *In the Interest of A. T.*, 271 Ga. App. at 473-74 (same).