**FOURTH DIVISION**
**DILLARD, C. J.,**
**RAY, P. J., and SELF, J.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**September 20, 2017**

# In the Court of Appeals of Georgia

A17A0881. IN THE INTEREST OF E. G. L. B. et al., children.

DILLARD, Chief Judge.

The father of E. G. L. B. and I. N. R. B., two minor children, appeals from the juvenile court's order terminating his parental rights.[1] In doing so, he contends that (1) there is insufficient evidence that the children's dependent status is likely to continue, that the children's continued dependency is likely to cause serious physical, mental, or emotional harm, or that termination of his parental rights was in the children's best interest; (2) he was deprived of due process throughout the juvenile-court proceedings; and (3) the juvenile court erred in denying his motion to dismiss

---

[1] The juvenile court also terminated the mother's parental rights, but her appeal was dismissed because she failed to file a timely notice of appeal. *See* Case No. A17A0882 (January 18, 2017).

under OCGA § 15-11-301. For the reasons set forth *infra*, we vacate the judgment and remand the case for additional proceedings consistent with this opinion.

On appeal, we view the evidence in the light most favorable to the juvenile court's disposition to determine whether any rational trier of fact could have found by clear and convincing evidence that the father's parental rights should have been terminated.[2] Nonetheless, as we have repeatedly emphasized,

> this deferential standard of review is tempered by the fact that there is no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship. It must be scrutinized deliberately and exercised most cautiously. The right to raise one's children is a fiercely guarded right in our society and law, and a right that should be infringed upon only under the most compelling circumstances.[3]

---

[2] *In the Interest of D. M.*, 339 Ga. App. 46, 46 (793 SE2d 422) (2016); *accord In the Interest of J. A. B.*, 336 Ga. App. 367, 368 (785 SE2d 43) (2016).

[3] *In the Interest of D. M.*, 339 Ga. App. at 46; *see, e.g.*, *In the Interest of E. M. D.*, 339 Ga. App. 189, 204 (793 SE2d 489) (2016); *In the Interest of J. A. B.*, 336 Ga. App. at 368; *In the Interest of S. O. C.*, 332 Ga. App. 738, 743 (774 SE2d 785) (2015); *In the Interest of C. J. V.*, 323 Ga. App. 283, 283 (746 SE2d 783) (2013); *see also Clark v. Wade*, 273 Ga. 587, 596-97 (IV) (544 SE2d 99) (2001) ("Parents have a constitutional right under the United States and Georgia Constitutions to the care and custody of their children. This right to the custody and control of one's child is a fiercely guarded right that should be infringed upon only under the most compelling circumstances." (punctuation omitted)).

So viewed, the record reflects that the children, E. G. L. B. (born October 15, 2009) and I. N. R. B. (born May 24, 2011), first came to the attention of the Division of Family and Children Services ("DFCS") in February 2012, when it was reported that the mother and father were using methamphetamine and had drug paraphernalia in the home, the children had severe diaper rash, and the mother was engaging in prostitution. At an announced home visit, DFCS found no signs of drug use, but was thereafter unable to contact the mother again. And in May 2014, after the mother admitted to a police officer that she had used methamphetamine, her drug use was then reported to DFCS. But DFCS was once again unable to locate the family for further investigation.

The father has been incarcerated since April 2013, and in October 2014, the children were placed in the care of their mother's aunt and uncle after the mother was also incarcerated. Almost a year later, in August 2015, the mother attempted to regain custody of the children, but they were placed in foster care because the mother's aunt and uncle had failed to obtain counseling for E. G. L. B., who had been repeatedly acting out sexually. By this time, the mother was no longer incarcerated, but DFCS alleged that foster care was in the children's best interest given the mother's admitted

history of drug use and domestic violence with the children's father, her absconding from DFCS, and her lack of income.

On September 1, 2015, following a hearing on August 25, 2015, at which neither parent appeared, the juvenile court found by clear and convincing evidence that the children were dependent and placed them in the temporary custody of DFCS. Specifically, the juvenile court determined the children were dependent due to the father's incarceration, the mother's history of substance abuse and absconding from DFCS, and the mother's instability, lack of housing, and lack of income. An August 2015 report, prepared by the children's guardian ad litem, indicated that the children had last seen the father in 2013, and they had talked to him on the phone "a few times" since then. A subsequent report, also prepared by the guardian ad litem, noted that the father had a 2012 conviction for possession of methamphetamine, as well as 2013 convictions for aggravated assault, possession of a knife during a crime, and possession of counterfeit drugs.

A second hearing was set for October 20, 2015. In response to notice of the hearing sent to him by mail, the father wrote to the court, inquired as to whether the court would issue a bench warrant since he would not be able to appear at the hearing and whether a conference call might be possible. He also stated, "I am interested in

4

the well[-]being of my children and want to be involved in their lives. However, if I [cannot] be of any assistance[,] I do not wish to transfer for court." The court responded to the father's letter, informed him that no bench warrant would issue and a conference call was not possible, and gave instructions on how to request an attorney. Although a handwritten note attached to this letter indicates that a copy of the case plan was also sent to the father, it is not clear from the record what documents were sent.

The record contains a "Case Plan Report" for the children, including a non-reunification plan for the father. Steps for "[a]ll [p]arents" include signing a release of information; attending "all hearings, appointments with DFCS, [c]ase [p]lan reviews, and scheduled visits"; notifying DFCS of any change in address; providing DFCS with the names and location of any "relatives or other resources"; and contacting DFCS to schedule an appointment to review the parent's progress on the case plan. The plan also notes that "[t]argeted case management services will be received to assist individuals in gaining access to and managing needed services."

Neither parent appeared at the October 20, 2015 hearing. On November 3, 2015, *nunc pro tunc* to October 20, 2015, the juvenile court adopted its September 1 order as a final order. The court also found that the children continued to be

dependent. Furthermore, the juvenile court determined that the father's maximum release date was in February 2023, although the basis for this finding is not clear from the record,[4] and noted that the father had a non-reunification case plan. But in the same order, the juvenile court found that, to be considered for a return of custody, the father would need to have stable, adequate income and housing for six months, complete a drug-and-alcohol assessment and treatment, undergo a psychological evaluation and comply with any resulting recommendations, complete domestic-violence counseling, complete a parenting class, pay child support, and "establish and maintain a bond with the children through visitation or otherwise." The court also noted that the father had "provided no proof to [DFCS] of the completion of any goals."

In February 2016, DFCS filed a petition to terminate both parents' parental rights, and a hearing was initially set for May 17, 2016. Despite an attempt at personal service of the petition and accompanying summons, the father could not be served because he was no longer at Coastal State Prison, where he had previously

---

[4] A September 2016 report of the guardian ad litem also notes that the father's maximum possible release date is in 2023.

been incarcerated. The father was ultimately personally served at Floyd County Correctional Institute on May 6, 2016. Upon receipt of his summons, the father requested appointment of counsel and an extension of time for the hearing. The court appointed counsel for the father, and based on a request from the mother, the hearing was continued to September 6, 2016.

In the meantime, the court issued an order on April 26, 2016, following a permanency hearing earlier that month. In that order, the juvenile court found that with regards to the father's compliance with the case plan for reunification, such compliance was "[n]ot applicable as there is no permanency plan of reunification." The court further found that the father had not been in contact with DFCS or the children.

At the hearing on the petition to terminate, the father did not appear but was represented by counsel. Witnesses testified that E. G. L. B. had reported observing his mother have sex. He also reported that his "dad" had touched him when he was four years old, but the father had gone to prison before E. G. L. B. turned four. Furthermore, E. G. L. B. referred to different people as "dad," and he never clarified which "dad" touched him. There was also extensive testimony regarding the mother's

house, which she was renting from a relative who lived on the same property and is a registered sex offender. Among other issues, the house was infested with roaches and wasps, lacked air conditioning and smoke detectors, and harbored several dangerous conditions, including broken glass on the porch, and medications and construction supplies in locations accessible to children. The children's DFCS caseworker testified to her concerns about the possibility of the children being returned to the mother's custody, including that the mother's home was dangerous and unsuitable and the children were not bonded with the mother. The case worker also testified that the children were doing well in their placement and were bonded with their foster parents, who wished to adopt them.

At the hearing, the mother testified that she had previously been addicted to pain medication, which she claimed resulted from the father's influence. The father also used methamphetamine. The mother and father's drug abuse occurred in 2010, and they eventually ended their relationship in 2012. Following their split, the father provided no support for the children, but he had regular contact with them, although he did not contact them "a lot." The father's brother, who is also the mother's current

boyfriend, testified that after the father was incarcerated, he asked his brother "numerous times" to check on the children. Prior to the September 2016 hearing, the mother had last spoken to the father almost a year ago.

The DFCS caseworker testified that the father was going to be incarcerated for a "long time[.]" DFCS initiated no contact with the father, aside from providing him with a copy of his case plan in September 2015. After DFCS did not receive a response, it made no attempt to contact the father again. The father did write to DFCS in August 2016, to find out how the children were doing, but DFCS had not responded to his letter at the time of the hearing.

The father presented evidence of certifications from classes that he completed in prison, including "Active Parenting Now," "Thinking for Change," "Re-entry Skills Building Program," and "Motivation for Change." No testimony was presented regarding the father's criminal convictions or his anticipated release date.

Following the hearing, the juvenile court terminated the father's parental rights on September 14, 2016. This Court thereafter granted the father's application for discretionary appeal.

At the outset, we note that the new Juvenile Code applies in this case because the State's petition to terminate parental rights was filed in February 2016.[5] And like the former Juvenile Code, Georgia's new Juvenile Code provides for a two-step process to determine whether terminating parental rights is warranted in a particular case.[6]

First, as outlined in OCGA § 15-11-310 (a), the juvenile court must find that one of five statutory grounds for termination has been satisfied. And here, the statutory ground at issue is OCGA § 15-11-310 (a) (5), which provides that

> [a] child is a dependent child due to lack of proper parental care or control by his or her parent, reasonable efforts to remedy the circumstances have been unsuccessful or were not required, such cause of dependency is likely to continue or will not likely be remedied, and the continued dependency will cause or is likely to cause serious physical, mental, emotional, or moral harm to such child.

Then, if the foregoing statutory grounds for termination have been met, the juvenile court must determine whether termination is in the child's best interest after

---

[5] *See* Ga. L. 2013, p. 294, § 5-1 ("This Act shall become effective on January 1, 2014, and shall apply to all offenses which occur and juvenile proceedings commenced on and after such date.").

[6] *Compare* OCGA § 15-11-310 *with* OCGA § 15-11-94 (2013).

considering several specified factors.[7] Of course, in all such proceedings, "the standard of proof to be adduced to terminate parental rights shall be by clear and convincing evidence."[8]

Necessarily, our analysis is "guided by an overarching constitutionally based principle that the termination of parental rights is a remedy of last resort which can be sustained only when there is clear and convincing evidence that the cause of the deprivation is likely to continue."[9] Indeed, as our Supreme Court has emphasized, "[o]ne who is subject to the termination of parental rights cannot be equated to an individual who faces an interruption of custody; termination is a much more severe measure."[10] Stated another way, "it is one thing to remove a child from a parent's

---

[7] *See* OCGA § 15-11-310 (b) (1)-(4).

[8] OCGA § 15-11-303.

[9] *In the Interest of D. M.*, 339 Ga. App. at 51 (punctuation omitted); *accord In the Interest of E. M. D.*, 339 Ga. App. at 204; *In the Interest of J. V. J.*, 329 Ga. App. 421, 424 (765 SE2d 389) (2014); *In the Interest of T. Z. L.*, 325 Ga. App. 84, 94 (1) (a) (751 SE2d 854) (2013); *In the Interest of C. J. V.*, 323 Ga. App. at 287.

[10] *In the Interest of A. C.*, 285 Ga. 829, 833 (2) (686 SE2d 635) (2009); *accord In the Interest of D. M.*, 339 Ga. App. at 51; *In the Interest of S. O. C.*, 332 Ga. App. at 742.

custody for reasons of neglect, but quite another to permanently and irrevocably sever the natural parent-child relationship."[11] And there is a reason for this crucial distinction: "Terminating a parent's rights, and thus forever foreclosing the possibility of restoring the natural parent-child relationship, is governmental extinguishment of the parent and child's constitutional right to familial relations."[12] There is, then, "no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship."[13] Accordingly, "compelling facts" are required to terminate parental rights.[14]

---

[11] *In the Interest of S. O. C.*, 332 Ga. App. at 742; *accord In the Interest of D. M.*, 339 Ga. App. at 51.

[12] *In the Interest of S. O. C.*, 332 Ga. App. at 742-43.

[13] *In the Interest of D. M.*, 339 Ga. App. at 51; *accord In the Interest of S. O. C.*, 332 Ga. App. at 743; *In the Interest of L. J. L.*, 247 Ga. App. 477, 479 (543 SE2d 818) (2001). Indeed, the termination of a natural parent's right to familial relations with his or her child "leaves the parent with no right to visit or communicate with the child, to participate in, or even to know about, any important decision affecting the child's religious, educational, emotional, or physical development." *Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 39 (I) (A) (101 SCt 2153, 68 LE2d 640) (1981) (Blackmun, J., dissenting).

[14] *In the Interest of D. M.*, 339 Ga. App. at 51-52; *accord Carvalho v. Lewis*, 247 Ga. 94, 94 (274 SE2d 471) (1981); *In the Interest of S. O. C.*, 332 Ga. App. at 743.

And while the juvenile court is certainly permitted to consider past conduct in deciding whether the cause of dependency is likely to continue,[15] evidence of past unfitness, standing alone, is insufficient to terminate the rights of a parent in regard to his child.[16] Rather, clear and convincing evidence of "*present* unfitness is required."[17] And the record must also contain clear and convincing evidence that the cause of the dependency is likely to continue.[18] With these guiding principles in mind, we turn now to the father's claims of error.

1. As an initial matter, the father does not contest that his children are dependent because he is currently incarcerated and incapable of assuming custody of

---

[15] *In the Interest of D. M.*, 339 Ga. App. at 52; *accord In the Interest of C. J. V.*, 323 Ga. App. at 285; *In the Interest of C. S.*, 319 Ga. App. 138, 145 (1) (735 SE2d 140) (2012).

[16] *In the Interest of J. D. F.*, 277 Ga. App. 424, 427 (1) (626 SE2d 616) (2006); *accord In the Interest of C. J. V.*, 323 Ga. App. at 285; *In the Interest of D. L. T. C.*, 299 Ga. App. 765, 769 (1) (684 SE2d 29) (2009).

[17] *In the Interest of C. J. V.*, 323 Ga. App. at 285; *accord In the Interest of J. V. J.*, 329 Ga. App. at 424-25; *In the Interest of D. L. T. C.*, 299 Ga. App. at 769 (1).

[18] *In the Interest of C. J. V.*, 323 Ga. App. at 285; *accord In the Interest of D. L. T. C.*, 299 Ga. App. at 769 (1); *In the Interest of K. M.*, 240 Ga. App. 677, 680 (523 SE2d 640) (1999).

them.[19] But the father asserts that the evidence was insufficient to establish that the children's dependent state was likely to continue or unlikely to be remedied in the foreseeable future. We agree.

Specifically, the father contends that "DFCS offered no competent proof" of his crimes "or how long he will actually be incarcerated." As set forth above, there was no testimony presented at the hearing regarding the exact nature of the father's conviction, his sentence, or release date.[20] And although the guardian ad litem's report noted that the father had been convicted of aggravated assault and that his maximum possible release date was in 2023, the basis of this information is not clear from the report. Accordingly, the juvenile court found that the father's "conviction history and sentence are unknown, as no evidence was put forth in this or any other hearing about those issues."

---

[19] *See* OCGA § 15-11-311. We also note that because the father did not appeal from the juvenile court's prior determinations that the children were dependent, we assume the evidence was sufficient to support those determinations. *See, e.g.*, *In the Interest of D. M.*, 339 Ga. App. at 53 (1) (a).

[20] The State, in its brief, asserts the father's maximum release date is in February 2023 and, in support of its assertion, points this Court to the website of the Georgia Department of Corrections. But of course, "[a] brief cannot be used in lieu of the record for adding evidence." *In the Interest of T. L. H.*, 240 Ga. App. 201, 202 (523 SE2d 50) (1999).

And as the father notes, "[i]mprisonment alone does not automatically authorize a termination of parental rights premised upon parental unfitness; there must be circumstances in aggravation."[21] One such circumstance that may be considered is "whether the incarcerated parent has made an effort to communicate with the child and, despite imprisonment, maintain a parental bond in a meaningful, supportive and parental manner."[22] Here, the juvenile court found that the father had been unable, due to his incarceration, to maintain any sort of bond with his children. And in determining that the cause of the children's dependency was likely to continue and not likely to remedied and that the continued dependency will cause or is likely to cause serious physical, mental, emotional, or moral harm to the children, the only specific factual finding the juvenile court noted was "the lack of bonding and attachment testified to[.]" But while there was testimony that the children were not bonded with their mother, there was no testimony presented at the hearing as to the

---

[21] *In Interest of R. A.*, 226 Ga. App. 18, 20 (486 SE2d 363) (1997); *see In the Interest of T. Z. L.*, 325 Ga. App. at 94 (1) (a) ("a parent's incarceration does not always compel the termination of parental rights").

[22] *In the Interest of T. Z. L.*, 325 Ga. App. at 94 (1) (a); *accord In the Interest of D. M. W.*, 266 Ga. App. 456, 459 (2) (597 SE2d 531) (2004).

15

father's parental bond or lack thereof with the children. To the contrary, the record contains evidence that the father has made attempts—sporadic and meager though they may have been—to contact the mother, his brother, the court, and DFCS regarding the children's well-being. Thus, even viewing the evidence in the light most favorable to the trial court's disposition, as we must,[23] the trial court's finding in this regard is not supported by clear and convincing evidence.

Another circumstance to be considered is "a history of incarcerations for repeated criminal offenses and a determination that it is likely such criminal activity will continue upon release."[24] For example, "repeated incarceration preventing one from caring for a child indicates a likelihood of continued deprivation."[25] But here, the record does not contain any evidence—much less clear and convincing evidence—indicating that the father has a history of repeated incarcerations.

---

[23] *See, e.g.*, *In the Interest of J. A. B.*, 336 Ga. App. at 368.

[24] *In the Interest of T. Z. L.*, 325 Ga. App. at 95 (1) (a) (punctuation omitted); *accord In the Interest of J. D. F.*, 277 Ga. App. 424, 428 (1) (626 SE2d 616) (2006); *In the Interest of M. C. L.*, 251 Ga. App. 132, 134 (1) (a) (553 SE2d 647) (2001).

[25] *In the Interest of T. Z. L.*, 325 Ga. App. at 95 (1) (a) (punctuation omitted); *accord In the Interest of M. C. L.*, 251 Ga. App. at 134 (1) (a).

The father also challenges the "sufficiency and reasonableness of the efforts exerted by DFCS to reunify him with his children[.]" Indeed, another aggravating factor that may be considered in determining whether to terminate the parental rights of an incarcerated parent is the parent's "failure to comply with goals in a *reunification* plan."[26] And here, the juvenile court found that the father had failed to comply with the court-ordered reunification plan. But there was no court-ordered reunification plan, as the father has always been subject to a non-reunification plan. This finding, then, is also contrary to the evidence.

We are, of course, extremely troubled by the fact that the father has been incarcerated for most of the children's lives and by the seemingly limited role he has played in their upbringing. And it may well be that his parental rights should ultimately be terminated. But we are equally troubled by the lack of evidence presented in this case *specific to the father* and, on this scant record, we are unable

---

[26] *In the Interest of T. Z. L.*, 325 Ga. App. at 94 (1) (a) (punctuation omitted); *accord In the Interest of J. D. F.*, 277 Ga. App. at 428 (1); *In the Interest of D. M. W.*, 266 Ga. App. at 459 (2). *See generally* OCGA §§ 15-11-202 (providing that, except in certain circumstances, "reasonable efforts shall be made to preserve or reunify families"); 15-11-203 (a) (setting forth the circumstances under which reunification efforts are not required); 15-11-204 (establishing the procedure for non-reunification hearings).

17

to conclude there was clear and convincing evidence that, as to him, the children's

dependency was likely to continue.[27] We remind our juvenile courts, yet again, of the

importance of ensuring that clear and convincing evidence has been presented by the

---

[27] *See In the Interest of T. Z. L.*, 325 Ga. App. at 89, 94-98 (1) (a) (concluding that there was not clear and convincing evidence that the deprivation by the father was likely to continue given his upcoming release date, the many letters he sent to the child, and his non-reunification case plan, which was not achievable, given his incarceration); *In the Interest of R. C. M.*, 284 Ga. App. 791, 799 (III) (3) (645 SE2d 363) (2007) (concluding that there was not clear and convincing evidence that the deprivation caused by the father was likely to continue where DFCS "adopted a reunification case plan for the father which included goals it knew he could not achieve while incarcerated[,]" the juvenile court repeatedly told the father to contact a caseworker after his release from incarceration to begin work on the case plan, yet DFCS petitioned to terminate his parental rights while he was still incarcerated, and the juvenile court terminated the father's parental rights based on his previous incarceration and his failure to achieve his reunification case plan goals within 45 days of his release); *In the Interest of J. D. F.*, 277 Ga. App. 424, 428-29 (1) (626 SE2d 616) (2006) (concluding that there was not clear and convincing evidence that the deprivation by the father was likely to continue given the short length of his incarceration, his "extensive" efforts to communicate with the children, and his efforts while incarcerated to complete a case plan "clearly not designed for him"); *In the Interest of B. N. A.*, 248 Ga. App. 406, 410-11 (1) (546 SE2d 819) (2001) (concluding that there was no clear and convincing evidence that the father was causing, or would continue to cause, the child to be deprived; although the father was not "without fault," in that he was previously convicted of a drug charge, currently faced other charges, and "could have taken greater initiative[,]" DFCS failed to establish a court-ordered reunification plan). *But see In the Interest of D. M. W.*, 266 Ga. App. at 460 (3) (finding clear and convincing evidence that the child's deprivation would continue where the mother had been incarcerated since the child was six months old, would not be released until the child was twelve years old, and did not comply with the portion of the case plan with which she was able to comply).

State before taking the drastic measure of permanently and irrevocably severing the natural parent-child relationship.[28] To paraphrase Justice Don Willett of the Supreme Court of Texas: The constitutional right of familial relations is not provided by government; it preexists government.[29] This cherished and sacrosanct right "is not a gift from the sovereign; it is our natural birthright. Fixed. Innate. Unalienable."[30] Accordingly, we vacate the juvenile court's order terminating the father's parental rights and remand for further proceedings consistent with this opinion.

As set forth above, the father also challenges the sufficiency of the evidence to support the juvenile court's findings that continued dependency would cause or likely cause harm to the children and that termination of his parental rights was in the children's best interest. Because DFCS failed to carry its burden of proving by clear and convincing evidence that the children's dependency was likely to continue, we do not reach the issue of whether continued dependency is likely to harm the

---

[28] *See In the Interest of S. O. C.*, 332 Ga. App. at 742; *accord In the Interest of D. M.*, 339 Ga. App. at 51.

[29] *See Patel v. Texas Dep't of Licensing and Regulation*, 469 SW3d 69, 92-93(Tex. 2015) (Willett, J., concurring).

[30] *Id.*

children.[31] Similarly, it would be premature to consider whether termination of the father's rights was in the children's best interest.[32]

2. Based on our ruling in Division 1 *supra*, we need not address the father's remaining arguments.[33]

*Judgment vacated and case remanded. Ray, P. J., and Self, J., concur.*

---

[31] *In the Interest of T. Z. L.*, 325 Ga. App. at 99 (1) (b); *accord In the Interest of R. C. M.*, 284 Ga. App. at 800 (III) (3); *see In the Interest of C. S.*, 319 Ga. App. at 148 (1) ("Because we have found the evidence does not support a determination that the deprivation is likely to continue, we need not consider whether the children were being harmed by the deprivation and do not reach the second stage of the inquiry concerning the best interests of the children.").

[32] *See In the Interest of T. Z. L.*, 325 Ga. App. at 99 (1) (b). *See supra* note 31.

[33] *See, e.g.*, *In the Interest of J. D. F.*, 277 Ga. App. at 429 (2).