A05A0776. McCOLLUM v. JONES et al.
(619 SE2d 313)

ADAMS, Judge.

The mother of J. B. J. appeals the decision of the superior court terminating her parental rights to the child and granting an adoption in favor of the paternal grandmother and her husband.

J. B. J. was born out of wedlock on January 19, 1998, and lived with his mother and biological father and two older half-siblings by the same mother; they had been living for one or two years in a home owned by the paternal grandfather in Bartow County. J. B. J.'s biological father had drug problems, and in March 2000, he was incarcerated for drug-related offenses, although the details are not in the record. The father of one of the siblings, to whom the mother was married at some point, was also incarcerated.

On April 27 and 28, 2000, the mother was arrested and charged with possession of drugs in Cobb County and for trafficking drugs in Bartow County out of the paternal grandfather's house. As a result of both parents' criminal problems, the children were removed, and on July 21, 2000, the Bartow County Juvenile Court found the children to be deprived (as so stipulated by the parents), ordered a plan for reunification, placed J. B. J. in the temporary custody of his paternal grandmother — one of the petitioners — and placed the half-siblings in the temporary custody of the paternal grandparents of one half-sibling (these people are not parties to this matter). J. B. J. was two years old at the time. His father was still in a half-way house as of July 21, 2000, but he obtained legitimation for the child shortly before the

---

[33] See *Habel*, supra at 618 (2).

court entered this order. The mother lived with her own mother at least part of the time after her arrest.

The court also ordered: (1) that the mother pay $25 per child per week in child support; (2) that no party discuss the case or make negative remarks about any other party within earshot of the children; (3) that the mother comply with all scheduled visitations, which must be supervised by the custodians; (4) that the children's maternal grandparents have no contact with the children unless they each submitted to a psychological evaluation; and (5) that the two half-siblings receive psychological evaluations. The court ordered that the visitations were to occur "as agreed between the parties." The court "anticipated" reunification with the mother at that time and it reiterated the elements of the reunification plan that had been prepared by the Bartow County Department of Family and Children Services. The court noted that the mother reported an income of $260 per week. Finally, the order specifically provided for its own termination: "This order shall expire on May 3, 2002, unless sooner terminated by Order of this Court."

On April 19, 2001, about one year after her arrest, the mother pleaded guilty to a felony violation of the Georgia Controlled Substances Act in Cobb County and was sentenced to ten years probation; on June 19, 2001, the mother was found guilty following trial in Bartow County of trafficking amphetamines and incarcerated, and on August 14, 2001, she was sentenced to twenty-five years, with twelve years to serve and thirteen years probation, plus a $200,000 fine. On appeal, her conviction in Bartow County was affirmed by this Court. *McCollum v. State*, 258 Ga. App. 574 (574 SE2d 561) (2002).

On August 7, 2001, following the verdict but prior to sentencing, the juvenile court held a hearing on a petition for nonreunification and subsequently decreed that the children be permanently placed with "fit and willing relatives" pursuant to the initial deprivation order. This order was based at least in part on what proved to be an erroneous assumption that the mother would have to serve a minimum of ten years prison time as part of her sentence. The grounds given for nonreunification were "conviction of a felony (trafficking in amphetamines) and imprisonment which has created a demonstrable negative effect in the quality of the parent-child(ren) relationship." There are no subsequent orders by the juvenile court in the record.[1]

On December 2, 2002, after the mother had been in prison for over one year, J. B. J.'s paternal grandmother and stepgrandfather

---

[1] Only those portions of the juvenile court record that were introduced as evidence in the adoption proceeding brought in superior court are included in the record on appeal.

(the "petitioners") filed a petition in the Cobb County Superior Court to adopt J. B. J. based on claims that the father had relinquished his rights to the child and that the mother had lost hers. On May 5, 2003, the superior court entered an order granting temporary custody of the child to the petitioners pending resolution of the adoption proceeding. On or about June 22, 2004, approximately 18 months after the petition to adopt was filed, the mother was paroled. Earlier, on February 5, 2004, the Polk County Juvenile Court dismissed all pending deprivation petitions concerning the two half-siblings, and those children eventually returned to the mother's custody after she was paroled. Since her parole, the mother has moved into her parents' home, found employment as the manager of a tune-up clinic, resumed her parental role with regard to the two half-siblings, and begun to make support payments for J. B. J.

A final hearing was held on August 26, 2004, on the petition to adopt, and the trial court granted the petition thereby terminating the mother's rights to the child.

1. The mother's claim that the paternal grandparents lacked standing to bring an adoption petition is without merit. Under certain circumstances, relatives, including grandparents, are specifically authorized to seek adoption of a child even if the child has a living parent or guardian. See OCGA §§ 19-8-3; 19-8-7; 19-8-10. Under those Code sections, a relative, as defined therein, may seek adoption if he or she can show that each living parent or guardian has either voluntarily surrendered his or her rights in the child to that relative or should lose his or her rights to be a parent pursuant to OCGA § 19-8-10. The petition in this case as amended alleges just such a claim.

2. The trial court did not abuse its discretion by denying the mother's request for a continuance.

The paternal grandparents petitioned for adoption on December 3, 2002. They amended their petition four times, and the second, third and fourth amendments were filed eight days before, the day before, and the day of the final hearing — which was specially set for and held on August 26, 2004. On the day of the hearing at 9:40 a.m., the mother filed a motion for continuance, in which she asserted without specifics that more time was needed because the second amendment raised several new and different issues, but it is not clear from the record whether the judge actually saw this motion. At the beginning of the hearing, the mother's counsel requested a continuance and stated that the final two amendments had arrived by facsimile at 4:47 p.m. the previous day and that "I haven't had a chance to really look into these issues that are raised." The trial court denied the request on the grounds that counsel had not explained which amendments required

a continuance or whether the amendments were merely cumulative as opposed to new issues.

This adoption proceeding was brought in superior court in accordance with OCGA § 19-8-2. "Granting or refusing a continuance is a matter within the sound discretion of the trial court, and absent a clear showing of abuse, [an appellate] court will not reverse for refusing to grant a continuance." *Livingston v. State*, 266 Ga. 501, 503 (467 SE2d 886) (1996). Counsel did not explain whether the recent amendments materially changed the allegations of the petition or how any such changes affected his ability to prepare. Furthermore, counsel failed to react for seven days to the most significant of the final three amendments and only sought a continuance on the day of the specially set hearing. And, the mother's claim of surprise regarding the need to show that she made support payments fails because a failure to support was alleged in the first amendment made in 2003. We cannot say that the trial court abused its discretion.

3. In five separate enumerations of error, the mother challenges the court's decision terminating her parental rights. The court determined that termination was warranted for three independent reasons authorized by OCGA § 19-8-10 (a), (b) (1), (2): that the mother failed to support the child for a year or more prior to the adoption petition; that she failed to maintain communication with the child for the same period; and that she failed to exercise proper parental care or control of the child. Each of these reasons also required the court to determine that the proposed adoption was in the best interest of the child. Id.

"[T]he appropriate standard of appellate review in a case where a parent's rights to his child have been severed is 'whether after reviewing the evidence in the light most favorable to the appellee, any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost.' " *Blackburn v. Blackburn*, 249 Ga. 689, 694 (2) (292 SE2d 821) (1982); *In the Interest of D. L. T.*, 238 Ga. App. 491, 496 (519 SE2d 257) (1999). See also *Thorne v. Padgett*, 259 Ga. 650, 651 (386 SE2d 155) (1989) (clear and convincing evidence required at trial).

> A court is not allowed to terminate a parent's natural right because it has determined that the child might have better financial, educational or even moral advantages elsewhere. Only under compelling circumstances found to exist by clear and convincing proof may a court sever the parent-child custodial relationship.

(Citations, punctuation and emphasis omitted.) *Blackburn*, 249 Ga. at 694.

With regard to the best interests test in adoption cases, a superior court has very broad discretion, which will not be questioned except in cases of plain abuse. *Bateman v. Futch*, 232 Ga. App. 271, 274 (2) (501 SE2d 615) (1998).

Although it is a rare case where this Court reverses a lower court's determination of what is in the best interest of the child, we find a reversal necessary in this case given all the facts and circumstances, and upon consideration of the well-known principle that natural parents have a fundamental liberty interest protected by the Constitution in the care, custody, and management of their children. *Santosky v. Kramer*, 455 U. S. 745, 753 (102 SC 1388, 71 LE2d 599) (1982); see also *Blackburn*, 249 Ga. at 692; *Cafagno v. Hagan*, 213 Ga. App. 631, 634 (3) (445 SE2d 380) (1994). Cf. OCGA § 19-7-1 (b.1) (in custody disputes between the parent and certain close relatives, there is a rebuttable presumption that it is in the best interest of the child or children for custody to be awarded to the parent or parents of such child or children).

(a) We begin by concluding that on only one of the three statutory grounds for termination relied upon by the superior court is there clear and convincing evidence as required. And even in that case, and solely for the purpose of examining the best interest of the child below, we note that the weight of the evidence is not great.

(1) *Failure to support the child.* The trial court found that termination was authorized under OCGA § 19-8-10 (b) (2) on the ground that the mother significantly failed without justifiable cause, for a period of one year or longer immediately prior to the filing of the petition for adoption, to provide for the care and support of that child as required by law or judicial decree. Because the petition was filed on December 2, 2002, the relevant period of time is the year or more immediately prior thereto. OCGA § 19-8-10 (b) (1). Roughly speaking, the mother was incarcerated for 18 months immediately prior to the petition for adoption. For 11 months prior to that but after the deprivation order, the mother awaited trial subject to the deprivation order, including the requirement that she pay $25 a week in support for J. B. J.

In the July 2000 deprivation order, the juvenile court found that the mother made $260 per week and ordered her to pay $25 per week to the petitioner to support J. B. J. In the final adoption order, the superior court found as a matter of fact that the petitioner only received $125 between July 26, 2000, and November 7, 2001.[2] The court found that the mother paid only $20 to the petitioner during her

---

[2] This finding is partially supported by the petitioner's testimony that she only received $125 from the time that the child came to live with her until the time the mother was

incarceration. The court accurately noted that the mother explained her inadequate payment history by claiming that the termination date on the original deprivation order relieved her of any obligation as of May 3, 2002; that "you don't get paid in prison"; that "there were a couple of months there [the petitioner] might not have got paid, but their [sic] was a couple of months she would not allow me to talk to him or see him"; and "I paid (support) every time she would allow me to meet him." Based on these facts, the trial court held that the mother's support payments were sporadic and de minimis at best and that her failure to pay was not justified. See *In re J. S. J.*, 180 Ga. App. 873, 875 (3) (350 SE2d 843) (1986) ("sporadic and de minimis" efforts do not require the court to find that there have been significant steps).

It is the petitioners' burden to prove that termination of the mother's parental rights is warranted, including the lack of justifiable cause. As explained by the Supreme Court of Georgia, the words "without justifiable cause" as used in OCGA § 19-8-10 (b) are constitutionally significant. *Thorne*, 259 Ga. at 651-652. The Due Process Clause gives a parent substantial protection of his or her parental rights requiring that clear and convincing evidence of unfitness be shown before a natural parent's rights in his child may be terminated. Id. Furthermore, adoption laws must be strictly construed. *Johnson v. Eidson*, 235 Ga. 820, 821 (221 SE2d 813) (1976). Accordingly, the burden of proof under OCGA § 19-8-10 (b) (1), (2) is placed on the petitioner, and this includes the burden of presenting clear and convincing evidence that the failure to pay support was unjustified:

> It is not enough that a substantial failure be shown to have existed for the requisite statutory period; unless it can also be shown that such failure was without justifiable cause. . . .

*Jones v. Sauls*, 213 Ga. App. 55, 56 (2) (443 SE2d 693) (1994). See also *Findley v. Sanders*, 153 Ga. App. 146, 148 (2) (264 SE2d 659) (1980) (prima facie showing includes substantial failure as well as lack of justifiable cause).[3]

That the mother significantly failed to pay support for a year or more immediately prior to the petition for adoption is clear.[4] This

---

incarcerated; it appears the mother was incarcerated at the time of the verdict, i.e., June 19, 2001.

[3] The burden of proof was not an issue in *Griffith v. Brooks*, 216 Ga. App. 401 (454 SE2d 602) (1995), and therefore that case is not in conflict with this decision.

[4] We note that the evidence presented regarding the mother's support payments in connection with the two half-siblings, as well as evidence of her visitation and communication with those children, is irrelevant to the petitioners' claim for adoption based on either paragraph (1) or (2) of OCGA § 19-8-10 (b). Those paragraphs specifically address communication with and support of "that child," i.e., the one for whom adoption is sought. Id.

leaves the question of whether clear and convincing evidence was presented that the mother lacked justifiable cause.

" 'Justifiable cause' for the failure to pay child support may be found in situations where the parent has been unable to earn income due to incarceration, mental illness, mental incapacity, hospitalization, or other circumstances beyond their control. See *Thorne*[, supra]; [cits.]" *Bateman*, 232 Ga. App. at 272-273. Each case must be decided on its own circumstances. *Jones*, 213 Ga. App. at 58. As the trial court correctly noted, incarceration does not per se give rise to justifiable cause for failure to pay support, rather it is simply one factor to be considered. See *Griffith v. Brooks*, 216 Ga. App. 401 (454 SE2d 602) (1995); *Jones*, 213 Ga. App. at 58.

With regard to the 18 months prior to the petition to adopt, i.e., while the mother was incarcerated, there is no evidence in the record that the mother was capable of paying. The mother testified that there were no jobs in jail, and there is no evidence in the record that she had other means to pay such as unemployment compensation or a house she could sell like the father in *Chandler v. Cochran*, 247 Ga. 184, 189 (11), 190 (13) (275 SE2d 23) (1981). The petitioners did not introduce any evidence whatsoever regarding the mother's financial condition during her incarceration. Accordingly, the petitioners failed to show that the mother failed to pay support without justifiable cause during the period of her incarceration.

Nevertheless, the petitioners introduced evidence by way of the juvenile court's finding that the mother had an income of $260 per week as of July 2000 at the time that she was ordered to pay $25 per week, and the mother gave weak reasons for not paying regularly. We conclude that any rational trier of fact could have found by clear and convincing evidence that the mother lacked justifiable cause for failure to pay during the 11 months preceding her incarceration.[5] Even so, given that no evidence was presented to show a lack of justifiable cause for the 18 months immediately preceding the adoption petition, at a minimum, it stretches the meaning of OCGA § 19-8-10 (b) to base termination on the mother's support history prior to that time. "Adoption laws are to be strictly construed in favor of natural parents, for the application thereof results in the severance forever of the paternal relation." *Coleman v. Grimes*, 250 Ga. App. 880, 890 (553 SE2d 185) (2001).

(2) *Failure to communicate with the child.* The trial court found that termination was authorized under OCGA § 19-8-10 (b) (1) on the

---

[5] See *Griffith*, 216 Ga. App. at 401 (termination upheld where father, despite employment, was unjustifiably $1,150 in arrears (22-month's worth) on court-ordered child support at the time that he was incarcerated and also failed to make any payments during incarceration).

ground that the mother significantly failed — without justifiable cause — for the same time period to communicate or to make a bona fide attempt to communicate with that child in a meaningful, supportive, parental manner. The same standard of review described above applies.

The trial court made a finding of fact that is supported by the record that the petitioner/paternal grandmother *did not accept* the mother's telephone calls, letters, and cards for the child while the mother was incarcerated. Indeed, the petitioner/paternal grandmother testified that she understood the nonreunification order of August 2001 to mean that she was not supposed to get the mother and child together any more. The court also found that the mother "did, sporadically, try to contact the Child during the time in which she was incarcerated by means of telephone calls, letters and sending cards and gifts." The court noted that some of her letters were returned "due to the references in the letters regarding the possibility of reunification, as well as negative comments about Petitioners." For the 16 months preceding her incarceration, the trial court found that the mother visited the child but "failed to attend scheduled visits with the Child . . . more often than she attended said visits," and that when she did not attend, "she would often fail to call or inform Petitioner . . . in advance that she would be late or unable to attend."

We hold that a rational finder of fact cannot conclude that there was clear and convincing evidence that the mother failed without justifiable cause to maintain a relationship with the child. Although the mother's attempts may have been sporadic while incarcerated, given the fact that for 18 months immediately prior to the adoption petition the petitioner was stonewalling the mother's efforts to communicate, we conclude that clear and convincing evidence of unjustified failure was not presented. Although sporadic and de minimis efforts are not enough to show a bona fide attempt to communicate with the child in a meaningful, supportive, parental manner, see *In re J. S. J.*, 180 Ga. App. at 875 (3), we cannot ignore the effect that the admitted stonewalling by the petitioner had on the mother's efforts.

When we examine the period of time prior to 18 months before the adoption petition, we also conclude that clear and convincing evidence was lacking for that time period as well. First, the trial court specifically found that the mother *did attempt* to communicate with the child by letter since July 2000, when the child was placed with the petitioners. Next, the deprivation order of July 2000 did not set out a schedule for visitation, rather it provided that visitation was to be encouraged and that visitations were to occur "as agreed between the parties." The petitioner admitted that the mother made "probably not more than ten" visits during the year before she was incarcerated,

including for a birthday party for her daughter, although she was late. She also admitted the mother sent $20 and a birthday card on the child's third birthday, which would have occurred during this period of time. But the petitioners presented no evidence to suggest that the visits that did occur were not meaningful, supportive, and parental. Finally, "probably not more than ten" amounts to almost one visit per month. Given these facts as presented by the petitioner and found by the trial court, the evidence that the mother missed the majority of scheduled visits during the 11-month period prior to her incarceration, sometimes without an explanation or warning, does not on its own amount to clear and convincing evidence of an unjustified failure to make a bona fide attempt to communicate with the child in a meaningful, supportive, and parental manner.[6]

(3) *Failure to exercise proper parental care or control.* The trial court found that termination was authorized because clear and convincing evidence was shown that the mother failed to exercise proper parental care or control due to misconduct or inability as set forth in OCGA § 15-11-94 (b) (4). See OCGA § 19-8-10 (a) (4).

In this case, there is no evidence to support the third and fourth parts of the four-part test of parental misconduct or inability found in OCGA § 15-11-94 (b) (4). Part three requires clear and convincing evidence that the cause of the deprivation is likely to continue or will not be remedied. OCGA § 15-11-94 (b) (4) (A) (iii). Here, the deprivation and nonreunification orders make clear that the original deprivation caused by the mother was her conviction of a felony and subsequent incarceration. There is no evidence in the record that either is likely to recur.

The superior court appears to have added that deprivation was also caused by the mother's arrearage on child support, her uncertain housing plans, her "fluctuating" housing partners, and her continued refusal to accept responsibility for her actions and to respect court orders. Even if true, clear and convincing evidence was not presented to show that the combined total of these failures would satisfy the fourth part of the test for parental misconduct or inability — that is that any elements of continued deprivation (as found by the court to exist) "will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child." OCGA § 15-11-94 (b) (4) (A) (iv).

Although the child's guardian opined that the deprivation caused by the mother's continued refusal to accept responsibility for her

---

[6] Although the superior court found that two letters from the mother to the child that were in the record contained negative comments about the petitioners and hinted at the possibility of reunification, the court immediately thereafter ruled that these letters could not be considered by the court.

actions and to respect court orders would continue, he did not testify that it would harm the child. The guardian also admitted that the major harm to the child was being taken away from his mother because of her incarceration, a condition which, as explained above, is not likely to continue in the future. The petitioner testified that she would be concerned if the child was returned to the mother because, in her words, the mother "manipulates. That's shown in the other children, the way they have talked to me and the way they think. And she's really a dangerous person. There's no telling what she's going to do." Although the mother owed past child support, the evidence was that she had a job and was providing for her other two children. We find the sum total of this evidence does not amount to clear and convincing evidence that the child would be harmed by being returned to his mother's care.

(b) *The best interest of the child.* The final requirement for termination under OCGA § 19-8-10 (a) and (b) is that the court must determine that "the adoption is in the best interests of the child." With regard to the best interests test, a superior court has very broad discretion, which will not be questioned except in cases of plain abuse. *Bateman*, 232 Ga. App. at 274 (2).

The best interests test is specifically defined in OCGA § 19-8-10 (a) as a consideration of "the physical, mental, emotional, and moral condition and needs of the child who is the subject of the proceeding, including the need for a secure and stable home." In the related area of child custody, the Supreme Court has described best interests as

the child's interest in a safe, secure environment that promotes his or her physical, mental, and emotional development. In considering what is in the best interest of the child, the trial court may consider the child's historical relationship with the parent, the child's relationship with the third-party custodian, and the child's special medical, emotional, or educational needs.

*Clark v. Wade*, 273 Ga. 587, 593 (544 SE2d 99) (2001).

In this case, the only evidence is that J. B. J. is a normal, healthy, well-adjusted child and that he always has been. He has been living with the petitioners since issuance of the original deprivation order. According to the testimony of his kindergarten teacher and his school principal at parochial school, he has excelled academically, is well-adjusted emotionally, and has had near-perfect attendance. The petitioner/grandmother has shown herself to be an involved and concerned parent and has always attended to the child's needs. She loves the child and is devoted to him. Should their advanced age

render the petitioners unable to care for J. B. J., the petitioners have made provisions for legal guardianship with a relative.

But the evidence also shows that the mother is properly caring for two other well-adjusted children. Her 15-year-old son has a 3.7 or 3.8 grade point average in tenth grade. He testified that he loves his mother, and he described a happy home life. His younger sister testified that she is much happier now that she is living with her mother again, and that they have a good home life. The mother has also taken steps to improve these children's education since she left prison. She lives on the edge of one school district but sends these children to school in the next district, for which she had to pay a "deposit," because the school system is better in her opinion. She testified that she loves all her children, and that her goal is to go back to school, keep a job, and support her kids. After leaving prison, she was hired as an assistant manager of a tune-up clinic and has since been promoted to be the manager. The petitioner admits that the mother began making support payments after she was released, although she testified that she only received $150 prior to the hearing. But the mother introduced money order receipts totaling $200, which would equal eight weeks of payments, and the trial court found as a matter of fact that the mother had only been released on June 22, 2004, which was only nine weeks prior to the hearing. The mother's father testified that the two siblings in their mother's care have chores and that she interacts with them, plays ball with them, cooks, works, and goes to church. Since the mother's release, the petitioner has begun to allow contact between the mother and child, and she admits that the mother calls to talk to the child, and that the mother called and left a message for the child that she loved him. Finally, despite the guardian's opinion regarding the inadequacy of the mother's home, the guardian had taken no steps to observe the mother's home.

The evidence shows that there was someone to be concerned about in each home. The court was concerned about the effect on the child of living in the same home as the maternal grandparents and specifically concerned about the maternal grandmother's mental condition. The maternal grandfather testified that she had a bad emotional problem and that she had recently left the home after she "snapped" and became physically violent with him. He did not expect her to return. Meanwhile, the guardian testified that J. B. J.'s father, who also has a drug-related criminal background, has contact with the child through the petitioner. And the guardian admitted that he had not spoken with the father to see if he had taken responsibility for his own actions, which, as stated above, was one of the key reasons the

guardian recommended terminating the mother's rights. Furthermore, the father had voluntarily relinquished his rights, clearly showing that he had no intention of caring for the child.[7]

In summary, the evidence showed that the child was very likely to have his physical, mental, emotional, and moral needs equally met in either home.[8] Under these circumstances, the case is controlled by the fundamental liberty interest of the mother to the care, custody, and management of her own children.

*Judgment reversed. Ellington, J., concurs. Smith, P. J., concurs in the judgment only.*

DECIDED JULY 15, 2005 —
RECONSIDERATION DENIED JULY 29, 2005 — 

*Robert E. Brooks, Jr.*, for appellant.
*William C. Burn, Josie Redwine*, for appellees.

---

[7] The superior court also relied on the fact that J. B. J.'s half-siblings had had contact with the maternal grandparents despite the initial deprivation order that provided that they should have no contact unless they submitted to a psychological exam. But much of the contact occurred while the mother was incarcerated and cannot be attributed to her behavior. Furthermore, given that the siblings are now in their mother's custody, there is no evidence that the original deprivation order is still in effect.

[8] *Mellies v. Dearborn*, 253 Ga. App. 138 (558 SE2d 460) (2001), upon which the trial court relies, is distinguishable because in that case there was evidence that the child became upset when the mother took him away from the grandparents' home and that removing him from that home would seriously harm him.