**THIRD DIVISION**
**DILLARD, C. J.,**
**GOBEIL and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 19, 2019**

# In the Court of Appeals of Georgia

A19A0490. IN THE INTEREST OF M. R. B., A CHILD

GOBEIL, Judge.

Jason Gasca, the father of M. R. B., appeals from the Whitfield County Juvenile Court's order terminating his parental rights to his daughter,[1] arguing that the decision was not supported by clear and convincing evidence. For the reasons explained below, we agree and reverse.

"On appeal, we view the evidence in the light most favorable to the juvenile court's disposition to determine whether any rational trier of fact could have found by clear and convincing evidence that the father's parental rights should have been terminated." *In Interest of E. G. L. B.*, 342 Ga. App. 839, 839-840 (805 SE2d 285)

---

[1] The juvenile court also terminated the biological mother's parental rights, but she is not a party to this appeal.

(2017) (punctuation and footnotes omitted). In applying this deferential standard of review, we are mindful that "there is no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship. It must be scrutinized deliberately and exercised most cautiously." Id. Accordingly, it is not sufficient if the record merely contains some evidence to support the juvenile court's factual findings. Rather, the record must contain evidence that is "clear and convincing." Id.; see also *Santosky v. Kramer*, 455 U.S. 745, 748 (102 S. Ct. 1388, 71 L. Ed. 2d 599) (1982) ("Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires the State support its allegations by at least clear and convincing evidence."). "[U]nder Georgia law, clear and convincing evidence is an intermediate standard of proof which is greater than the preponderance of the evidence standard ordinarily employed in civil proceedings, but less than the reasonable doubt standard applicable in criminal proceedings." *In Interest of K. M.*, 344 Ga. App. 838, 847 (2) (811 SE2d 505) (2018) (citation and punctuation omitted). To be clear, "the juvenile court's preference that custody of a child remain with someone other than her natural parents is wholly without consequence, where the court lacks clear and convincing evidence to support that decision." Id. (citation and punctuation omitted).

Viewed in the light most favorable to the judgment, the record reflects that the mother and Gasca were not married, and M. R. B. was born on February 21, 2014. In May 2014, Whitfield County's Division of Family and Children Services ("the Department") became involved with the mother based on the mother's alleged drug use and unstable housing. In July 2014, when M. R. B. was five months old, she was removed from her mother's custody, and the Department filed a dependency petition. In relevant part, the dependency petition noted that Gasca had been arrested four years prior for theft by taking and possession of methamphetamine. Subsequently, in October 2014, the juvenile court found that it was in the best interest of M. R. B. for Gasca to have legal and physical custody.[2]

In early May 2015, the Department removed M. R. B. (then 14 months of age) from Gasca's home and filed a new dependency petition based on concerns regarding Gasca's alleged alcohol abuse, his lack of cooperation with the Department's investigation, and concerns over physical altercations between M. R. B.'s mother and M. R. B.'s paternal grandmother in M. R. B.'s presence. The following month, the juvenile court dismissed the dependency petition and entered a protective order,

_____

[2] The juvenile court also entered an order of legitimation declaring that Gasca was M. R. B.'s biological father.

returning M. R. B. to Gasca's custody, and ordering "[t]he father to cooperate with the efforts of [the Department] to prevent or eliminate further removal of the child from the home," and the Department to "continue services with the family on an ongoing basis in as necessary to insure the child's safety."[3]

Approximately two years later, on July 31, 2017, the Department took custody of M. R. B. (then age 3) and thereafter filed a new dependency petition, alleging, in relevant part, that (1) both the mother and Gasca were incarcerated; (2) Gasca left M. R. B. with a relative who was not suitable for placement and failed to provide direct care of M. R. B. for several months; (3) Gasca had refused to cooperate with the Department in its efforts to prevent removal of M. R. B.; and (4) M. R. B. was without medical insurance and was not up to date on her physical examinations or her vaccines. Following a hearing in August 2017, the juvenile court entered an order finding M. R. B. dependent and ordering Gasca to pay $45.00 per week in child support.[4] Gasca did not appeal.

---

[3] The order did not specify what services the Department was providing, and there is no other indication from the record what services the court was referencing.

[4] Although the father was served with notice of the dependency hearing, he was not present due to his incarceration and was not otherwise represented by counsel.

Two months later, in October 2017, the case came before the juvenile court for a case plan review, initial judicial review, and permanency planning hearing. The father was not present, but was represented by counsel. The juvenile court adopted the Department's recommended "Nonreunification/Adoption" permanency plan. The court explained that there was no plan for reunification with either parent, and

[i]n order to be considered for a return of custody the father would need to complete a [Comprehensive Child and Family Assessment] and follow any recommendations therein. The father would need to obtain and maintain stable, sufficient housing and income for a period of at least six consecutive months. He would need to complete a psychological evaluation and follow any recommendations therein. He would need to complete a parenting/nurturing class approved by [the Department] and provide proof of the same. He would need to undergo an alcohol and drug assessment and complete any recommendations. The father would need to maintain visitation with the child as long as same is beneficial to the child and pay support for the child in the amount of at least $45.00 per week until an account has been established with Child Support Enforcement. . . .

The compliance of the father has been: The father has attended visitation twice and completed a negative drug screening on September 8, 2017. There was an incident at the first visit wherein the father's ex-

girlfriend[5] called police. On the date of this hearing [the father] is incarcerated on multiple charges. . . .

The current visitation between the mother, father and the child is: Each parent had attended two visits with the child prior to this hearing. As of the date of this hearing, both parents are incarcerated. There was an incident at the father's first visit, where his ex-girlfriend called police. The child is experiencing nightmares and bedwetting surrounding the visits. The Court hereby suspends all visits between the child and parents until further Order of this Court. The Court finds that visitation with the parents is not in the best interest of the child at this time.

Gasca did not appeal.

Four months later (and only seven months after taking custody of M. R. B.), in February 2018, the Department petitioned for termination of parental rights, alleging, in relevant part, that termination of Gasca's parental rights was warranted and was in M. R. B.'s best interest because: Gasca wantonly and willfully failed to provide support for a period of more than six months; M. R. B. (then age four) had been abandoned, was without parental control and dependent and dependency was likely to continue; Gasca was incarcerated with a maximum possible release date of

_____

[5] The record confirms that the ex-girlfriend referred to by the court was not M. R. B.'s mother, but rather the mother of Gasca's other two children.

September 25, 2020, and was incapable of adequately providing for M. R. B.'s needs; Gasca was instructed in the October 2017 dependency order as to the goals he needed to complete to be considered for a return of custody and failed to complete these goals; M. R. B. was in a safe adoptive placement and in need of a "stable and secure permanent home,"; and M. R. B. "would continue to be harmed if allowed contact with her parents even on a visitation basis, as the parents have not demonstrated their ability to either care for or protect the child."

A Permanency Plan Hearing was held in April 2018. Although the record indicated that the father was served with notice at least 72 hours prior to the hearing, he was not present and was not represented by counsel. The Department's recommended permanency plan was "Adoption following Termination of Parental Rights," and the court adopted the recommended plan. Gasca did not appeal.

The hearing on the Department's petition to terminate parental rights was held in May 2018. Gasca's request to be present at the hearing was denied, as was his request for a continuance based on an upcoming parole eligibility window, but he was permitted to appear telephonically and was represented by counsel. As detailed further below, two witnesses testified at the hearing: M. R. B.'s foster care case manager and Gasca.

M. R. B.'s foster care case manager, Erin Bennett, testified that Gasca was subject to a non-reunification plan and was instructed as to what he needed to do to be considered for a return of custody.[6] The case manager testified that, at the time M. R. B. was taken into custody, she was living with relatives and Gasca was not providing direct care and had a warrant out for his arrest. She was "not sure" how long M. R. B. had been with the relatives. She stated that Gasca had been incarcerated for the majority of the time in which M. R. B. was in the Department's custody, except "for a month or two" in the beginning during August and September 2017. During that brief time, he had not provided any proof of completion of case plan goals. However, he visited with M. R. B. three or four times at the public visitation center, but the visits were suspended after police were called during a visit.[7] The case manager confirmed that she was not present at the visits, but she concluded based on her review of documentation from the visits that Gasca's anger issues during the visit

---

[6] The case manager acknowledged that because Gasca was subject to a non-reunification plan, the Department was not required to, and did not, provide Gasca with any assistance to meet the requirements necessary to be considered for reunification.

[7] The record established that the police visit was not related to Gasca's conduct with M. R. B., but because Gasca's ex-girlfriend and another woman were present at the visitation center and an altercation ensued.

in which police were called caused M. R. B. to urinate on herself on the way home, and that M. R. B. had experienced bed wetting, and nightmares following visits. The case manager stated that M. R. B. was thriving and happy in her foster home and the foster parents intended to adopt her. She confirmed that the Department was asking the court to terminate parental rights of both parents based on their extensive criminal histories and unstable backgrounds.

On cross-examination, the case manager testified that she met with Gasca at least two or three times while he was incarcerated and he expressed a willingness to complete his case plan and regain custody of M. R. B., and that he intended to take parenting and substance abuse classes while incarcerated. She acknowledged that those classes were not available at the facility where he was incarcerated, and that it is very difficult for someone to complete a case plan while incarcerated. She stated that, on at least one occasion, Gasca inquired about having telephone contact with M. R. B. and receiving pictures of her, but his request was denied. The case manager also confirmed that, after visitation was suspended, she instructed Gasca that he was not to have any contact or communication with M. R. B. She acknowledged that one of the case plan requirements was for him to have meaningful contact with M. R. B., but

stated that "[i]t is not appropriate for a four-year-old to have contact with an inmate. It would not be beneficial."

Additionally, the case manager testified that she never visited Gasca's home when he had custody of M. R. B., and that, in 2014, when he was given custody, the Department did not have any concerns. She opined that Gasca had not expressed a willingness and desire to be a caregiver for M. R. B. because he had not made any progress on his case plan, but she acknowledged that he loves and cares for the child. She also testified that Gasca had not paid any child support for M. R. B. since the Department took custody in July 2017.

Gasca, then age 27, testified that, in 2014, upon learning that M. R. B. had been removed from the mother's custody, he hired a lawyer so that he could pursue custody. He explained that he had custody of M. R. B. for most of her life and they bonded during that time. M. R. B. had her own room with her own bed, toys, and enjoyed playing on his phone and tablet and he taught her things, such as colors. He stated that he tried to stay in touch with the mother and encouraged her to maintain a relationship with M. R. B., but was unsuccessful. He confirmed that he took M. R. B. to the doctor when he was supposed to and properly clothed and cared for her, although he admitted that "[t]owards the end [M. R. B.] may have been behind on a

couple of her . . . shots." He stated that he asked his aunt for help "towards the end" because he needed help and he "felt like [it] would be the mature and appropriate thing to do instead of having my child in the situation that I was in."

Gasca stated that he had been incarcerated since September 25, 2017, for shoplifting from Walmart, was serving a sentence of 10 years to serve 3, and his maximum release date was in 2020. He explained that, he entered a guilty plea because he thought that, if he was released from prison within two years, he would be able to complete his case plan successfully and regain custody of his daughter. He acknowledged that he had a prior conviction for possession of methamphetamine in 2010 and a theft by taking conviction in 2011 and served time on those charges, but stated that those crimes occurred before the birth of his children and prior to his receiving custody of M. R. B. He also acknowledged that he had several other misdemeanor convictions, but he was not sure of the dates or the charges.[8] He admitted that, on September 26, 2017 (the day of his underlying arrest) he was in a motel room with a woman, but he denied knowing that, according to the police report,

[8]Specifically, the record reveals that Gasca also had misdemeanor convictions for driving with a suspended license, public drunkeness (three counts), theft by shoplifting and theft by deception, obstruction of law enforcement officer, family violence battery, and cruelty to children in the third-degree (for committing an act of family violence battery in the presence of a minor).

11

officers allegedly found a meth pipe or a marijuana roach in the room. Gasca denied using any drugs. The State did not introduce a copy of the alleged police report.

Gasca testified that he has two other children, boys ages four and two (who were not involved in the underlying termination proceeding), with another woman and he maintains a relationship with his sons. He denied having a history of domestic violence with M. R. B.'s mother, but acknowledged he had such a history with the mother of his sons. He admitted that in early September 2017, police responded to a domestic dispute between him and the mother of his sons, which occurred in the presence of his sons, but he reiterated that M. R. B. had not been present for any of those disputes. He confirmed that his relationship with the mother of his sons was not healthy and he had no intention of engaging in a romatic relationship or living with her upon his release.

Gasca expressed his willingness to complete his case plan and regain custody of M. R. B., but stated that the facility where he is incarcerated does not offer the classes that he is required to take as one of the steps to be considered for reunification. However, he stated that he requested a transfer to another facility that offers the classes he needs. He also stated that he desired to have contact with M. R. B., but the case manager denied his request.

Following the hearing, the juvenile court terminated Gasca's parental rights, concluding that M. R. B.'s dependency was likely to continue and to cause her serious harm. In reaching this conclusion, the juvenile court found that: Gasca had failed to provide proof of completion of case plan goals; he wantonly and willfully failed to comply for a period of more than 12 months with an order for child support;[9] he had only visited with M. R. B. twice since her removal; and he was presently incarcerated, with a maximum release date in 2020, and had a criminal history spanning nine years. Further, the court noted that, even assuming Gasca was paroled at an earlier date, he would need to complete a case plan, and "[a]t that point the child would have been in care for well over two years." Finally, the court found that "[i]f returned to his care, . . ., [M. R. B.] would be likely . . . exposed to instability, domestic violence and illegal drug use[.]" Gasca filed an application for discretionary review, which we granted. This appeal followed.

Georgia's Juvenile Code provides for a two-pronged analysis in a termination of parental rights action. First, the juvenile court must determine that one of the statutory grounds for terminating parental rights, as set forth in OCGA § 15-11-310

---

[9] In its findings of fact, the juvenile court stated that Gasca had failed to comply with the order of support for a period of more than six months, but in its conclusions of law stated Gasca had failed to comply for a period of more than twelve months.

13

(a) (2018),[10] is met. In this case, the juvenile court found that OCGA § 15-11-310 (a)

(5) was met, which authorizes termination of parental rights when:

> [a] child is a dependent child[11] due to lack of proper parental care or control by his or her parent, reasonable efforts to remedy the circumstances have been unsuccessful or were not required, such cause of dependency is likely to continue or will not likely be remedied in the reasonably foreseeable future, and:
>
> > (A) Returning such child to his or her parent is likely to cause serious physical, mental, moral, or emotional harm to such child or threaten the physical safety or well-being of such child; or
> >
> > (B) Continuation of the parent and child relationship will cause or is likely to cause serious physical, mental, moral, or emotional harm to such child.

---

[10] OCGA § 15-11-310 was amended effective July 1, 2018. See Ga. L. 2018, Act 474, § 3, eff. July 1, 2018. We apply the staute in effect at the time of our review, where, as here, doing so does not impair any vested rights under the prior law. See *In the Interest of L. L. B.*, 256 Ga. 768 (353 SE2d 507) (1987). Compare OCGA § 15-11-310 (2017) (applicable version at time of termination hearing) with OCGA § 15-11-310 (2018) (amended version in effect at time of review).

[11] For purposes of OCGA § 15-11-310 (a) (5), a "[d]ependent child" is defined as a child who . . . "[h]as been abused or neglected and is in need of the protection of the court . . . . [or] [i]s without his or her parent, guardian, or legal custodian." OCGA § 15-11-2 (22) (A), (C).

Second, once the juvenile court finds that one of the statutory grounds for termination is met, it must then determine whether termination is in the child's best interest after considering certain factors. See OCGA § 15-11-26.

With regard to the first prong, in determining whether a child's dependency is likely to continue, the juvenile court may consider past conduct, but, "evidence of past unfitness, standing alone, is insufficient to terminate the rights of a parent in regard to his child." *In the Interest of E. G. L. B.*, 342 Ga. App. at 845 (footnote omitted). Rather, "termination of parental rights is a remedy of last resort which can be sustained only when there is clear and convincing evidence that the cause of the dependency is likely to continue." *In the Interest of R. S. T.*, 345 Ga. App. 300, 306 (1) (812 SE2d 614) (2018) (citation and punctuation omitted).

> [Furthermore,] an order terminating parental rights must contain explicit findings supporting the conclusion that continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child. Merely reciting the legal standard and that it was met is not sufficient. Instead, the juvenile court must ascertain the facts and state not only the end result of that inquiry but the process by which it was reached.

Id. at 310 (3). With these principles in mind, we turn to the case at hand.

15

1. Gasca argues that the juvenile court's findings were not supported by clear and convincing evidence and that the court's order was riddled with material errors that warrant reversal.[12] After a thorough review of the record, we agree.

As an intial matter, because Gasca did not appeal the juvenile court's previous order finding that M. R. B. was dependent, he is bound by that order. *In the Interest of A. B.*, 346 Ga. App. 2, 8 (1) (b) (815 SE2d 561) (2018); *In the Interest of B. M.*, 298 Ga. App. 100, 102 (1) (a) (679 SE2d 113) (2009).

Following the termination hearing, as required under the first prong of the analysis, the juvenile court found that M. R. B.'s dependency was likely to continue and to cause serious harm. The court based this determination on the following findings: (1) Gasca "wantonly and willfully failed to comply for a period of twelve months or longer with a decree to support [M. R. B.]"; (2) Gasca had "a pattern of

---

[12] Gasca also argues that the case manager was not qualified as an expert, and therefore, was not qualified to opine that Gasca's visits with M. R. B. caused any harm or trauma and that this portion of her testimony should have been excluded. However, because Gasca did not object to the case manager's testimony at the hearing, he waived this issue for purposes of appeal. See *Francis v. Francis*, 279 Ga. 248, 249 (611 SE2d 45) (2005) ("[T]he failure to make an objection which is both timely and specific is treated as a waiver."); *In the Interest of H. D. M.*, 241 Ga. App. 805, 807-808 (2) (527 SE2d 633) (2000) (holding that the father waived claim that trial court improperly relied on hearsay in finding that termination of parental rights was warranted by failing to object at trial).

16

criminal activity spanning nine years" and was incarcerated with a maximum release date of 2020; (3) he only visited M. R. B. twice since her removal; (4) he failed to provide any proof of case plan goals; and (5) "[i]f returned to his care, . . ., the child would be likely . . . exposed to instability, domestic violence and illegal drug use[.]" As explained further below, we conclude the record does not contain clear and convincing evidence to support the termination of Gasca's parental rights.

First, nothing in the record supports the trial court's finding that Gasca wantonly and willfully failed to comply with a child support decree for 12 months or more. Instead, the record shows that the child support decree was not issued until August 2017, and thus, only nine months had lapsed at the time of the termination hearing in May 2018. Moreover, the record establishes that Gasca was incarcerated beginning in September 2017 (one month after the child support decree was entered). An inability to earn income due to incarceration may constitute justifiable cause for failing to pay child support and is one factor to be considered. See *In the Interest of E. M.*, 347 Ga. App. 351, 357 (1) (a) (819 SE2d 505) (2018); *McCollum v. Jones*, 274 Ga. App. 815, 821 (3) (a) (1) (619 SE2d 313) (2005) ("[I]ncarceration does not per se give rise to justifiable cause for failure to pay support, rather it is simply one factor to be considered."). There is no indication in the record before us that the court

17

considered whether Gasca's incarceration constituted justifiable cause for failure to pay child support. Moreover, the State bears the burden of proving by clear and convincing evidence that termination of Gasca's parental rights is warranted. *McCollum*, 274 Ga. App. at 820 (3) (a) (1). The State failed to present any evidence to show that Gasca was capable of paying child support or that his failure to pay support was unjustified.

With regard to Gasca's criminal history, "imprisonment alone does not automatically authorize a termination of parental rights. . . . Rather, there must be circumstances in aggravation." *In the Interest of E. G. L. B.*, 342 Ga. App. at 846 (1) (punctuation and footnote omitted). Some of the aggravating circumstances that may be considered include: (1) "whether the incarcerated parent has made an effort to communicate with the child and, despite imprisonment, maintain a parental bond in a meaningul, supportive and parental manner"; (2) whether the parent has "a history of incarcerations for repeated criminal offenses and a determination that it is likely such criminal activity will continue upon release"; and (3) whether the parent has "fail[ed] to comply with goals in a reunification plan." Id. at 846-847 (1) (citations, punctuation and footnotes omitted).

18

Although, the juvenile court found Gasca only visited M. R. B. two times since her July 2017 removal, this finding is contrary to the evidence. The case manager testified that Gasca visited M. R. B. three to four times following her removal (during the two month time frame in which Gasca was not incarcerated), but then the Department suspended his visitation. Additional testimony established that Gasca had a strong parental bond with M. R. B., and he requested permission to contact his daughter, as well as to receive pictures of her while incarcerated, but his requests were denied by the Department based on its position that "[i]t [was] not appropriate for a four-year old to have contact with an inmate."

Further, while Gasca has a pattern of criminal activity and is currently incarcerated on a felony theft charge with a maximum release date of 2020, his criminal record covers a period of less than eight years not nine as the trial court found. Additionally, many of his convictions, including his only other felony convictions and lengthy periods of incarceration, occurred before M. R. B. was born. And, although he had several misdemeanor convictions between 2015 to 2017, it appears the majority of those sentences were served on probation and do not demonstrate "repeated incarceration [that would] prevent one from caring for a child." *In the Interest of E. G. L. B.*, 342 Ga. App. at 847 (1) (explaining that "repeated

19

incarceration preventing one from caring for a child indicates a likelihood of continued [dependency]") (punctuation and footnote omitted). Rather, the record establishes that, despite his criminal history, in 2014, Gasca was given custody of M. R. B. when she was approximately 5 months old and he maintained that custody until her removal in July 2017.[13] Thus, although Gasca may be presently incarcerated, there was no clear and convincing evidence that Gasca had a history of repeated incarcerations following M. R. B.'s birth. Nor was there clear and convincing evidence of other aggravating circumstances that would prevent Gasca from caring for M. R. B., or that indicated a likelihood that her dependency will continue if his parental rights are not terminated. See *In the Interest of B. N. A.*, 248 Ga. App. 406, 410-411 (1) (546 SE2d 819) (2001) (father's previous drug offense conviction and current criminal charges was not clear and convincing evidence that his lack of proper parental care and control would continue to cause his child's dependency).

The juvenile court also found that Gasca failed to make any progress on his case plan goals. It is undisputed that Gasca was subject to a non-reunification plan, and in order to be considered for a return of custody, Gasca needed to obtain stable

---

[13] Although it is undisputed that M. R. B. was in her aunt's care at the time of her removal, the case manager testified that she did not know how long M.R.B. was in the aunt's care as opposed to Gasca's care.

housing and income for six months, pay child support, take a parenting class approved by the Department, submit to an alcohol and drug assessment, submit to a psychological evaluation, and maintain visitation with his daughter. The Department acknowledges that many of these goals are difficult, if not impossible to achieve while incarcerated, but the Department maintains that Gasca cannot complain of the consequences brought about by his voluntary commission of criminal acts. However, we have reversed the termination of a parent's rights where the parent did not have any realistic opportunity to complete case plan goals. See *In the Interest of R. C. M.*, 284 Ga. App. 791, 799-800 (III) (3) (645 SE2d 363) (2007) (reversing termination of father's parental rights where case plan included goals father could not acheive while incarcerated and he failed to achieve goals within 45 days of his release); *In the Interest of B. N. A.*, 248 Ga. App. at 410-411 (1) (reversing termination of father's parental rights where he had no opportunity to comply with a reunification plan because Department never established a plan as court-ordered and only six months elapsed between the time the court entered an order requiring a plan and the termination hearing); *In the Interest of K. J.*, 226 Ga. App. 303, 305-306 (1) (486 SE2d 899) (1997) (reversing termination of mother's parental rights where hearing

21

was held less than four months after the mother was released from prison and the case plan required the mother to obtain employment within six months of her release).

In this case, the Department filed the petition to terminate parental rights four months after the court informed Gasca of what he needed to do to be considered for a return of custody, and the termination hearing was held five months later. Thus, Gasca was not given a realistic opportunity to make any progress on the plan goals in order to be considered for a return of custody. Indeed, we find it troubling that even if Gasca was not incarcerated, he would not have had six months in which to meet the stable housing and income for six months requirement before the Department filed the petition to terminate his parental rights. Additionally, it is undisputed that the classes Gasca needs to complete are not available at the facility where he is incarcerated, but in an effort to make progress on his plan, Gasca requested a transfer to a different facility that has the necessary classes. Thus, based on the record in this case, we conclude there was not clear and convincing evidence to support the court's finding that Gasca failed to make progress on his case plan goals.

Finally, the juvenile court's finding that, if returned to Gasca's care, M. R. B. "would be likely . . . exposed to instability, domestic violence and illegal drug use" was not supported by the evidence. The case manager testified that she never visited

Gasca's home while he had custody of M. R. B., and that, at the time Gasca was given custody in 2014 the Department had no concerns. Although the record establishes that M. R. B. was removed from Gasca's care in 2015 for approximately one month, she was returned to his custody and the Department's dependency petition was dismissed. Further, Gasca testified that M. R. B. had her own room with her own bed and toys. He also testified that he tried to stay in touch with the mother and encouraged her to maintain a relationship with M. R. B., but was unsuccessful. He confirmed that he took M. R. B. to the doctor when he was supposed to and properly clothed and cared for her, although he admitted that "[t]owards the end [M. R. B.] may have been behind on a couple of her . . . shots." In other words, there was not clear and convincing evidence proffered to support a finding that if returned to Gasca's care, M. R. B. would likely be exposed to instability.

Similarly, while testimony was presented that Gasca had a prior 2010 conviction for possession of methamphetamine, no evidence was proffered that he had a current drug problem. Indeed, the juvenile court noted in the October 2017 dependency order that Gasca had passed a drug screening in September 2017. Although the Department's questions to Gasca at the termination hearing implied that a meth pipe and a marijuana roach were found in the motel room where he was

arrested, the Department presented no evidence in support of these alleged facts. Moreover, Gasca denied any knowledge that those items were in the room and denied using any drugs, and the Department failed to submit any evidence to the contrary. Thus, the court's finding that, if returned to Gasca's custody, M. R. B. would likely be exposed to illegal drug use was not supported by clear and convincing evidence.

Likewise, although there was significant testimony presented regarding Gasca's history of domestic violence with the mother of his sons (which Gasca did not dispute), no evidence was proffered that M. R. B. was exposed to any of these violent incidents. Furthermore, Gasca testfied that he had no intention of attempting reconciliation with the mother of his sons. Gasca denied having any domestic violence issues with M. R. B.'s mother, and no evidence to the contrary was presented. There was also no evidence in the record that Gasca ever abused M. R. B. Consequently, the juvenile court's finding that, if returned to Gasca's custody, M. R. B. would likely be exposed to domestic violence was not supported by clear and convincing evidence.

In light of the above, the juvenile court's findings in support of the termination of Gasca's parental rights under OCGA § 15-11-310 (a) (5) were not supported by

clear and convincing evidence. Accordingly, the juvenile court abused its discretion in terminating his parental rights based on this record, and we reverse.

2. In light of our holding in Division 1, we need not reach the issue of whether the juvenile court's finding that termination of Gasca's parental rights was in M. R. B.'s best interest was supported by clear and convincing evidence.

*Judgment reversed. Dillard, C. J., concurs. Hodges, J., concurs in judgment only.* **\***


**\*     THIS OPINION IS PHYSICAL PRECEDENT ONLY. COURT OF APPEALS RULE 33.2(a)**.