**THIRD DIVISION**
**DOYLE, P. J.,**
**REESE and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

***DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.***

**February 7, 2022**

# In the Court of Appeals of Georgia

A21A1474. IN THE INTEREST OF L-M. C. L., et al.

DOYLE, Presiding Judge.

Following the grant of her discretionary application, the mother of L-M. C. L., L. O. N. L., A. N. L., and J. F. C-L. appeals the trial court's order terminating her parental rights. She contends that: (1) the juvenile court erred by admitting drug test results; (2) the juvenile court incorrectly applied OCGA § 15-11-212 (f) (1); and (3) there was insufficient evidence to support the termination. For the following reasons, we find that the application for discretionary review was improvidently granted and dismiss this appeal.

On appeal from a termination order, we view the evidence in the light most favorable to the appellee and determine whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost. We do not weigh the

evidence or determine the credibility of the witnesses but defer to the trial court's factfinding and affirm unless the evidence fails to satisfy the appellate standard of review.[1]

So viewed, the record shows that the mother has four children who are at issue in this case: L-M. C. L., a girl born in 2016; L. O. N. L., a boy born in 2015; J. F. C-L., a boy born in 2008; and A. N. L., a boy born in 2007.[2] In January 2018, the Department became involved with the family based on repeated unexcused school absences. In March 2018, L-M. C. L. and L. O. N. L. were placed in the temporary custody of the Department based on the mother's admitted cocaine use and lack of a sanitary home environment. All four children were adjudicated dependent in September 2019, and they have remained in foster care throughout the case.[3] The

---

[1] (Punctuation and footnotes omitted.) *In the Interest of H. F. G.*, 281 Ga. App. 22, 23 (635 SE2d 338) (2006).

[2] Alvaro Navarro Calderon, who is the mother's husband, the legal father of the three youngest children, and the biological father of J. F. C-L., surrendered his parental rights to the three youngest children. The Department identified the biological father of L. O. N. L, but has been unable to identify the biological father of L-M. C. L. and A. N. L. The mother also has two very young children who are not at issue in this case; the juvenile court removed these two children from her custody, but the youngest is now back in her care.

[3] The mother did not contest the dependency finding.

mother's reunification case plan included the following goals or requirements: complete parenting classes; participate in individual counseling and a substance abuse evaluation and follow all recommendations therefrom; maintain a source of income and provide proof of income to the Department; attend medical appointments and school conferences; complete parenting classes; undergo a psychological and parental fitness assessment; and maintain a drug-free, clean home environment.

At a September 2018 review hearing, the juvenile court found the mother had completed a psychological evaluation and a substance abuse evaluation, but had failed to appear for six scheduled drug screens, failed to meet with her individual counselor, and failed to work with the children on their educational needs during visits, which were "sporadic and inconsistent." At an April 2019 review hearing, the juvenile court found that the mother had tested positive in all but one drug screen between November 2018 and April 2019. The mother gave birth to another child in January 2019, at which time the infant tested positive for illegal drugs and was placed in the care of the Department and cared for in the same foster home as the other children.

In March 2019, the mother began participating in a court-sponsored substance abuse program, Family Treatment Court ("FTC"); she successfully completed the first

3

phase, participated in consistent counseling and parenting skills training, and had been consistently visiting with the children since January 2019. On December 20, 2019, the juvenile court entered an order finding that since the preceding hearing, the mother had 26 positive drug screens for cocaine. After the mother left another drug treatment program in August 2019, FTC terminated her.

In September 2019, the Department filed a petition to terminate the mother's parental rights.[4] At the August 2020 termination hearing, the mother conceded that her long-term cocaine addiction was the reason for her children's dependency. She admitted that her son born in January 2019 was removed from her custody after testing positive for cocaine at his birth, and she used cocaine during her subsequent pregnancy with her sixth child born in April 2020. According to the mother, she last used cocaine on February 4, 2020, which use was reflected in a positive hair follicle test in February 2020. The mother conceded that since March 2019, she had entered but failed to complete approximately six drug treatment programs; she insisted, however, that she was "more serious" about her treatment this time, though she admitted that she was still financially supported by her husband, who was a "trigger" for her.

---

[4] The Department amended the petition in May 2020.

The mother had been court ordered to pay $200 per month in child support for the children at issue in this case. At the time of the termination hearing, she was approximately $2,000 in arrears; her only payments included an $84 payment in July 2019, $1,200 in COVID stimulus money that was captured as child support in May 2020, and $111.84 in August 2020. At the time of the hearing, the mother worked at a fast food restaurant, where she was training to be a manager and earned approximately $700 every two weeks.[5]

Christina Essington, a research and development manager for Averhealth, a company which drug tested the mother's urine and hair samples for the Department in 2020, testified that she had received test results from Averhealth's legal department and that the mother's samples were received in the normal course of procedures at the laboratory. Over the mother's objections to admission of her test results, the juvenile court admitted them under the business record exception. The records included: February 2020, July 2020, August 2020 hair tests that were positive for cocaine;

_____

[5] The mother's monthly car payment was $400, and her monthly rent was $450, half of which was paid by her husband.

negative urine tests taken in February 2020, July 2020, and August 2020; and a urine test in August 2020 that showed an abnormal creatinine level.

Angela Payne, who served as a parent/behavioral aide and supervised visits with the mother and the children, testified that virtual visits occurred in March and April 2020 due to COVID and mostly went well. According to Payne, the mother appeared "very focused on her sobriety," was "much more focused and dedicated" about parenting, and was "definitely a different parent sober."

Roseline Okala, the therapist for L. O. N. L., J. F. C-L., and A. N. L., testified that L. O. N. L. was working on being able to process his feelings of being in foster care and having to visit the mother; he said that he enjoyed visits with the mother and was happy when he returned to his foster home. J. F. C-L. was addressing a lying habit and communication skills with his siblings; he expressed that he liked to visit the mother and being in his foster home. Okala testified that A. N. L. was working on impulsive behavior, anger management, and being nice to his siblings; although A. N. L. told her that he did not hate the mother, he did not want to visit her or be returned to her care. In Okala's opinion, A. N. L. does not have an attachment that one would expect in a normal parent/child relationship and it would be harmful to force him to visit with the mother.

Stephanie Slayton, the Department's case manager for the family, testified that while the mother was showing progress in her outpatient program and had completed certain aspects of her case plan, she had never completed a substance abuse treatment program, her failure to do so showed that her sobriety was not stable enough to care for the children in the long term, and her recent drug screens showed a potential relapse. Although the mother had recently acquired housing, she was not financially independent or stable and had not achieved consistent employment. The children's medical needs were "strongly neglected" before coming into the Department's care. Since entering the foster home, the children had been doing well in school. Slayton had a strong concern about structure and routine, including the mother's nighttime work and plan for babysitting, if the children were returned to her custody. Although the mother demonstrated a pattern of intermittent drug use between efforts of sobriety, Slayton testified that the mother has "really shown . . . personal change and growth" since the birth of her youngest child, and she does "have the ability to change . . . and has worked very hard."

Renee Ware, the mother's counselor since April 2020, testified that the mother had been compliant, only missing one session, and had made a lot of progress and obtained goals set by Ware — including obtaining employment, getting her driver's

license back, working with a sponsor, and helping with her children's education. Ware expressed surprise at the mother's positive hair follicle screen, but noted that the cocaine levels in the samples were decreasing.

Tarsha Deadwyler, the manager for the mother's substance abuse treatment program, testified that the mother had recently completed Phase 1 of a drug treatment program. During Phase 1, the mother received treatment five days a week and took weekly drug screens, which were negative. Although Deadwyler was aware of the mother's positive hair follicle test, she was promoted to Phase 2 because she satisfied all program requirements for Phase 1. Deadwyler testified that the mother demonstrated "a willingness" for treatment, abstinence, and following instructions. Because of COVID, the program always administered drug tests on Thursdays or Fridays instead of on random days; the mother usually called on Tuesday or Wednesday to ask when she could take a test.

The juvenile court spoke with the two older children in chambers and summarized their statements afterwards: the children did not want to return home, preferred to remain in the foster home until their majority, were well taken care of and were doing well in school and in general, and their school attendance issues were mostly resolved. A. N. L. had no desire to interact with the mother in the future; J. F.

8

C-L. did not want to live with the mother, but he might want to have some contact with her in the future. The two were "united and steadfast in this position, even if it were to mean a permanent separation between them and their younger siblings."

The children's guardian ad litem recommended termination of the mother's parental rights, explaining that despite her recent strides, the children had been harmed by her long history of drug use and their resulting placement in foster care, demonstrating detachment and confusion.

Following the hearing, the juvenile court issued an order terminating the mother's parental rights to the four children at issue.[6] The court found, pursuant to OCGA § 15-11-310 (a) (3), that the mother had wantonly and willfully failed for a period of over 12 months to comply with a decree to support her children, stating that she had failed to comply with her child support obligation despite being fully capable of working and earning income to provide for the children. By failing to comply with court-ordered child support payments and leaving the children in the Department's care without provision for their support for over six months, the mother had abandoned the children, and such abandonment constituted aggravated circumstances under OCGA § 15-11-310 (a) (2).

---

[6] The court also terminated the parental rights of the children's fathers.

The juvenile court also found that, pursuant to OCGA § 15-11-310 (a) (4), the mother had abandoned the children by failing for a period of over six months to participate in a court-ordered plan designed to reunite her with them, noting that: the children had been in foster care for over two-and-a-half years; the mother had not substantially completed the case plan goals of addressing her substance abuse addiction, her housing needs, or the children's educational needs; and her repeated failure to complete substance abuse treatment demonstrated a willful failure to complete the case plan. The court concluded that the mother had failed to demonstrate that she could provide the necessary structure for the children, and she had not completed case plan components designed to address this issue. After finding that the mother failed to comply with the case plan requirement to complete substance abuse treatment, the court stated:

> [the mother] has not submitted [12] consecutive months of clean drug screens, as required, pursuant to [OCGA §]15-11-212 (f) (1), by this [c]ourt before the children may be returned to [her] custody. With a positive drug screen for August of 2020, the earliest date on which the children could be returned to [her] custody would be September of 2021, assuming [she] completed a clean drug screen every month, beginning in September of 2020.

The juvenile court further found, pursuant to OCGA § 15-11-310 (a) (5), that the children were dependent, there was clear and convincing evidence of parental misconduct or inability, and the mother had failed to properly parent and provide for their needs. The court stated that the lack of proper parental care or control by the mother — specifically, her chronic unrehabilitated substance abuse, which rendered her unable to adequately provide for the children's needs, her educational neglect of the children, and her failure to establish a stable home environment — was the cause of the children's dependency. The mother's drug use and addiction were clearly impacting her ability to provide for the children's basic needs, as evidenced by their excessive absences from school and the unsanitary conditions of the home.

The juvenile court explained that the mother had yet to prove an ability to independently engage with the children's educational needs, only talking with the boys about homework assignments and schoolwork after being prompted to do so by the case manager and parent aide at visits. Reasonable efforts to remedy the circumstances of the children's dependency — including referrals of the mother for substance abuse treatment, individual counseling, parenting education, supervised visitation, and random drug screens — had been unsuccessful.

11

The juvenile court found that the causes of the dependency were likely to continue due to the following: the mother's repeated failures to complete a substance abuse treatment program; her repeated positive drug screens, the latest of which occurred only days before the termination hearing; and the damage done to her bond with the children by virtue of their removal to foster care. The court stated that the mother had continued to use cocaine despite her ongoing involvement in a treatment program, and she may have obtained a source of clean urine to use for urine drug screens. The court found that returning the children to the mother or continuation of her relationship with them was likely to cause them serious physical, mental, emotional, or moral harm. The court stated that the mother's chronic unrehabilitated substance abuse, her failure to complete the case plan, and the overall neglect of the children's care demonstrated a lack of parental capacity that would necessarily result in harm to the children if they were returned to her.

Finally, after considering the children's physical, mental, emotional, and moral condition, the juvenile court found, pursuant to OCGA § 15-11-310 (b), that termination of the mother's parental rights was in the children's best interests. The court stated that the children had remained in foster care for two-and-a-half years as a result of the dependency created by the mother; they were clearly bonded with their

foster parents; and they were thriving in the foster home under a consistent routine and structure that afforded them the opportunity to devote themselves to their studies. The mother had no bond with A. N. L.; her bond with J. F. C-L. was weak at best; A. N. L. and J. F. C-L. stated unequivocally that they desired to remain in the foster home until they were of majority age; and the other two children saw the mother as a transient but welcome visitor in their lives. This appeal followed.

1. *Admission of the drug test results.* The mother contends that the trial court erred by admitting the drug test results from Averhealth. We disagree.

Under OCGA § 24-8-803 (6),[7] the following business records are admissible as a hearsay exception:

> [u]nless the source of information or the method or circumstances of preparation indicate lack of trustworthiness and subject to the provisions of Chapter 7 of this title, a memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, if (A) made at or near the time of the described acts, events, conditions, opinions, or diagnoses; (B) made by, or from information transmitted by, a person with personal knowledge and a business duty to report; (C) kept in the course of a regularly conducted business activity; and (D) it was the regular practice of that business activity to

---

[7] With exceptions not relevant here, hearings to terminate parental rights are conducted in accordance with Title 24. See OCGA § 15-11-304.

make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or by certification that complies with paragraph (11) or (12) of Code Section 24-9-902 or by any other statute permitting certification. . . .

"[I]t is not necessary that the person who actually prepared the business record testify, so long as other circumstantial evidence suggests the trustworthiness of the record."[8] "It is within the trial court's discretion to determine whether a proper foundation was laid for application of the business records exception to a particular document."[9]

Here, the juvenile court acted within its discretion by admitting the drug test results because they were admissible under the business records exception. Essington testified that: the samples were received and tested in the normal course of procedures at Averhealth; she knew about Averhealth's testing process; and the mother's tests and records indicated a proper collection and chain of custody to protect the integrity of the sample. Furthermore, each of the test reports included a certification from the

---

[8] (Punctuation omitted.) *Ciras v. Hydrajet Technology*, 333 Ga. App. 498, 500 (773 SE2d 800) (2015), quoting *United States v. Hawkins*, 905 F2d 1489, 1494 (II) (A) (2) (11th Cir. 1990). See also *Santana v. State*, 283 Ga. App. 696, 698 (1) (642 SE2d 390) (2007) (the witness's lack of personal knowledge regarding how the records were created does not render them inadmissible, but merely affects the weight given to them).

[9] (Punctuation omitted.)*Ciras*, 333 Ga. App. at 501.

14

technician who performed the test, stating that the technician was qualified to perform the test and that the results were reliable and accurate. Thus, the records were sufficiently trustworthy and otherwise admissible under OCGA § 24-8-803 (6).

Similarly, the Department authenticated the records by establishing that they were indeed the mother's drug test results. OCGA § 24-9-902 provides that

> [e]xtrinsic evidence of authenticity as a condition precedent to admissibility shall not be required with respect to . . . (11) The original or a duplicate of a domestic record of regularly conducted activity that would be admissible under paragraph (6) of Code Section 24-8-803 if accompanied by a written declaration of its custodian or other qualified person certifying that the record: (A) Was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of such matters; (B) Was kept in the course of the regularly conducted activity; and (C) Was made by the regularly conducted activity as a regular practice. A party intending to offer a record into evidence under this paragraph shall provide written notice of such intention to all adverse parties[10] and shall make the record and declaration available for inspection sufficiently in advance of their offer into evidence to provide an adverse party with a fair opportunity to challenge such record and declaration[.][11]

_____

[10] The mother makes no claim regarding any failure to provide advance notice under OCGA § 24-9-902 (11).

[11] See also OCGA § 24-9-901 (a) ("The requirement of authentication or identification as a condition precedent to admissibility shall be satisfied by evidence

15

Here, Essington's testimony and the certifications from the technicians established that the records were the mother's drug test results.[12] Additionally, the mother's claim that the admission of the drug test results violated her "confrontation right relating to chain of custody and the sample collection process" is unavailing.[13]

2. *The juvenile court's application of OCGA § 15-11-212 (f)*. The mother also argues that the juvenile court improperly applied OCGA § 15-11-212 (f). Again, we disagree.

OCGA § 15-11-212 (f) provides:

> If a child is adjudicated as a dependent child and the dependency is found to have been the result of substance abuse by his or her parent,

---

sufficient to support a finding that the matter in question is what its proponent claims.").

[12] See *Jones v. State*, 345 Ga. App. 14, 18 (2) (b) (812 SE2d 337) (2018) (for purposes of OCGA § 24-9-902 (11), an "other qualified person" need not have personal knowledge of the preparation of the records, but "must be familiar with the creation and record keeping procedures of the organization"), quoting *United States v. Bacas*, 662 FSupp2d 481, 486-87 (E.D. Va. 2009).

[13] Although a parent facing a termination of her parental rights has a due process right to confront the witnesses testifying against her, "a parental termination proceeding is not a criminal proceeding implicating the Sixth Amendment right of confrontation of a witness." *In the Interest of C. W. D.*, 232 Ga. App. 200, 209 (5) (501 SE2d 232) (1998), citing *Blackburn v. Blackburn*, 249 Ga. 689, 693 (292 SE2d 821) (1982). Nevertheless, the admission of hearsay evidence pursuant to the business records exception does not violate confrontation rights. See *Brown v. State*, 268 Ga. 76, 80 (485 SE2d 486) (1996).

guardian, or legal custodian and the court orders transfer of temporary legal custody of such child, *the court shall be authorized to further order that legal custody of such child may not be transferred back to his or her parent, guardian, or legal custodian unless* such parent, guardian, or legal custodian: (1) Undergoes substance abuse treatment and random abuse screenings and those screenings remain negative for a period of no less than 12 consecutive months; or (2) Successfully completes programming through a family treatment court division.[14]

Thus, the statute allows a juvenile court to impose a requirement that a parent with a substance abuse problem produce negative drug screens for 12 consecutive months before the children are returned to the parent. It appears that the juvenile court imposed such a requirement here. The court stated in the termination order that "[the mother] has not submitted [12] consecutive months of clean drug screens, *as required*, pursuant to OCGA § 15-11-212 (f) (1), *by this [c]ourt* before the children may be returned to [her] custody."[15] Accordingly, as authorized by OCGA § 15-11-212 (f), the juvenile court was merely enforcing the requirement of its previous order — that the mother submit 12 consecutive months of clean drug screens — and not proceeding under the belief that the statute required a particular outcome at the outset.

---

[14] (Emphasis supplied.)

[15] (Emphasis supplied.)

17

3. *Sufficiency of the evidence.* Finally, the mother argues that there is insufficient evidence to support the termination of her parental rights. This enumeration is without merit.

> A juvenile court's termination of parental rights involves a two-step process. First, the court must determine whether at least one of the five statutory grounds for termination enumerated in OCGA § 15-11-310 (a) has been met. Here, the Department proceeded under OCGA § 15-11-310 (a) (5), which provides a ground for termination when: A child is a dependent child due to lack of proper parental care or control by his or her parent, reasonable efforts to remedy the circumstances have been unsuccessful or were not required, such cause of dependency is likely to continue or will not likely be remedied, and the continued dependency will cause or is likely to cause serious physical, mental, emotional, or moral harm to such child.[16]

When assessing whether a child is dependent due to lack of proper parental care and control, the juvenile court may consider, inter alia, the following factors: A

> medically verified deficiency of the parent's physical, mental, or emotional health that is of such duration or nature so as to render such parent unable to provide adequately for his or her child; Excessive use of or history of chronic unrehabilitated substance abuse with the effect of rendering a parent incapable of providing adequately for the physical,

---

[16] (Punctuation omitted.) *In the Interest of R. S. T.*, 345 Ga. App. 300, 306 (1) (812 SE2d 614) (2018).

mental, emotional, or moral condition and needs of his or her child; and physical, mental, or emotional neglect of his or her child or evidence of past physical, mental, or emotional neglect by the parent of such child or another child of such parent.[17]

When

making this determination when the child is not in the custody and care of his or her parent, the court must also consider whether the parent has significantly failed, without justifiable cause, for a period of six months prior to the date of the termination hearing: (1) To develop and maintain a parental bond with his or her child in a meaningful, supportive manner; (2) To provide for the care and support of his or her child as required by law or judicial decree; and (3) To comply with a court ordered plan designed to reunite such parent with his or her child.[18]

Here, the trial court's findings that the mother failed to complete her case plan, that the children were dependent as a result of the lack of proper parental control and care by the mother, that the causes of the dependency were likely to continue, and that the continued dependency was likely to cause serious harm to the children, were supported by the record. Although the mother has shown recent improvements, she had not maintained consistent employment; she had over thirty positive drug tests

---

[17] OCGA § 15-11-311 (a) (1), (2), & (5).

[18] OCGA § 15-11-311 (b).

19

throughout the pendency of the case and repeated relapses; she used cocaine while pregnant with two subsequent children born in January 2019 and April 2020; her most recent negative drug tests were not random; she failed to financially support the children; and the two older children did not want to return to her care. The GAL recommended termination and explained that the mother's long-term drug use and the children's associated placement in foster care had harmed them.

> While the record does show the mother's [recent] efforts to comply with some aspects of the case plan, what weight to give that evidence was a question for the trier of fact. Likewise, judging the credibility of her good intentions was a task for the juvenile court. Moreover, the juvenile court was authorized to consider the mother's past conduct in determining whether the causes of deprivation were likely to continue. And the decision as to a child's future must rest on more than positive promises which are contrary to negative past fact. Given this record, we conclude that the juvenile court was authorized to terminate the mother's parental rights. In accordance with Court of Appeals rules, we granted the mother's application for discretionary review without the benefit of the full appellate record, including the transcript of the termination hearing; however, because the record supports the order of the court below, we conclude that the application for discretionary appeal was improvidently granted. Accordingly, the

order granting the mother's application is vacated, and her appeal is hereby dismissed.[19]

*Appeal dismissed. Reese and Brown, JJ., concur.*

---

[19] (Punctuation omitted.) *In the Interest of M. M. M. T.*, 327 Ga. App. 572, 575 (760 SE2d 188) (2014), quoting *In the Interest of A. M. B.*, 324 Ga. App. 394, 395-396 (750 SE2d 709) (2013). See also *R. S. T*, 345 Ga. App. at 308 (1) (b) ("Juvenile courts are authorized to find that a parent's conduct over the years was a better predictor of her future conduct than a few months of partial stability.") (punctuation omitted); *In the Interest of B. D. O.*, 343 Ga. App. 587, 592 (2) (807 SE2d 507) (2017) (recommendation of the guardian ad litem to terminate parental rights and the father's history of substance abuse supported termination); *In the Interest of L. P.*, 339 Ga. App. 651, 655-656 (1) (794 SE2d 252) (2016) (evidence supported finding that dependency was likely to continue, where mother had not been forthcoming about her ongoing drug issues and had not been successful in completing a drug treatment program); *In the Interest of S. O. C.*, 332 Ga. App. 738, 744-745 (1) & (2) (774 SE2d 785) (2015) (evidence supported juvenile court's findings that children were dependent and that cause of dependency was likely to continue, where the mother failed multiple drug tests, missed numerous drug screens, and failed to complete substance-abuse treatment classes and counseling sessions as part of her reunification plan).